BLACKBURNE-RIGSBY, Associate Judge:
This case presents a “rare” instance in which we conclude that “a self-incriminating statement was ‘compelled’ despite the fact that the law enforcement authorities adhered to the dictates of Miranda [v. Arizona, 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).]” Dickerson v. United States, 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Specifically, we conclude that a juvenile’s confession during custodial interrogation was involuntary, in spite of an effectively delivered Miranda warning and a knowing and intelligent waiver of Miranda rights, and we reverse the trial court’s adjudication of delinquency.[2]
Following a consolidated suppression hearing and bench trial, appellant S.W., a fifteen-year-old juvenile, was adjudicated delinquent on four counts: (1) carjacking, (2) attempted unauthorized use of a motor vehicle, (3) unlawful entry of a motor vehicle, and (4) threats to do bodily harm.[3] On appeal, appellant challenges the trial court’s denial of his motion to suppress *93 statements that he made during post-arrest interrogation. Appellant’s principal argument is that the interrogating detective’s pre-Miranda remarks rendered the subsequent Miranda warning ineffective as a matter of law and, consequently, that his confession must be suppressed. Alternatively, appellant argues that the detective’s remarks prevented him from making a knowing, intelligent, and voluntary waiver.
We hold that the interrogating detective delivered an effective Miranda warning and that appellant made a knowing and intelligent waiver of his Miranda rights, but that he did not do so voluntarily. In so holding, we avoid a per se rule that either invalidates a Miranda warning as a matter of law when law enforcement officials make pre-Miranda warning remarks, or that validates a Miranda warning as a matter of law when law enforcement officials read the warning verbatim from a waiver card.[4] We reinforce the necessity of looking holistically at every custodial interrogation in reaching a conclusion specific to the facts presented. No “talismanic incantation” is necessary to satisfy Miranda. Missouri v. Seibert, 542 U.S. 600, 611, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (citation omitted). Nor will “mere recitation of the litany [of rights]” suffice in every circumstance. Id. Rather, our inquiry is case-specific, asking “whether the warnings reasonably convey to a suspect his [or her] rights as required by Miranda.” Id. (internal quotation marks, citation, and alterations omitted).
I. Factual Background

A. The Incident

At approximately 10:00 a.m. on January 22, 2012, Tiffany Dougall was pumping gas into her car at a gas station on the corner of Benning Road and East Capitol Street, Northeast, Washington, D.C. She had left the driver-side door ajar with the keys in the ignition. Appellant approached Ms. Dougall’s car, sat in the driver seat, and attempted to start the car. As appellant tried to close the car door, Ms. Dougall pulled the door open and retrieved her keys, thwarting appellant’s attempt. Appellant exited the car and Ms. Dougall called him a “stupid a-- [expletive],” to which he responded: “I should have shanked you. That’s what we do around here.” Appellant then ran across the street and entered a metro station. Within approximately twenty minutes, officers of the Metropolitan Police Department (“MPD”) arrested appellant and brought him back to the scene where Ms. Dougall identified him.

B. The Interview

MPD Detective Howard Howland, questioned appellant at the MPD Juvenile Processing Center in a video-recorded session that began just before midnight and lasted approximately eighteen minutes. Appellant’s right foot was cuffed to the floor of the interview room, but his hands remained free. Before issuing a Miranda warning, Detective Howland introduced himself and asked appellant if he knew why he was under arrest.[5] When appellant did not respond, Detective Howland explained:
*94 I know you know why you’re up here, so I ain’t gonna play the 1 don’t know[5] crap, all right? I’m gonna give you an opportunity to give your version of what happened today, because :.. I stand between you■ and the lions out there .... [W]e have a lot of things going on out there, and they’re gonna try and say that you did it all. Okay? And I think what happened today was just a onetime thing. But before I came out here everybody said ... you did a whole bunch óf stujf, but' in order for us to have a conversation, I have to read you your rights and you have to waive your rights. ' If you answer no to any of the questions I ask you after I read you your rights, that’s all, I mean, I can’t have the interview, okay?
(Emphasis added). '
Detective Howland read appellant his Miranda rights from a waiver card, and appellant, who had not spoken until this point, waived these rights verbally and in writing.[6] Appellant’s demeanor and tone remained calm as he subsequently confessed to entering Ms. Dougall’s ear with the intention of taking it. After the confession, Detective Howland told appellant that he had spoken with appellant’s grandmother, who told Detective Howland that she was worried about appellant, that he had just been' released from a group home, and that he had been “reported missing.” Appellant began to cry at this point and explained that he had left the group home because he had a “beef with a whole lot of people.” Detective Howland stated, “[i]t sounds like you got a lotta anger” and “made some bad choices,” then told appellant to consider how it feels “for [his] grandmother -to see [him] in court” or “locked up,” stating that people “who tried to do what [appellant] did ... get full of bullets.” Detective Howland then asked appellant-what he would do differently if he could do everything over, and appellant responded “I wouldn’t have went to that car.”[7]

C. The Motion to Suppress and Trial

Appellant filed a motion to suppress the statements he made to Detective Howland, alleging, inter alia, that he did not knowingly and voluntarily waive his Miranda rights, and that the coercive circumstances of the interrogation rendered his statements involuntary. During a hearing on the motion, the trial court viewed the video recording of appellant’s.interrogation and characterized Detective Howland’s pre-Mi-randa remarks as a “very simple set of statements” that did not violate “Miranda’s prophylactic rule”; in essence, in- . forming appellant that “if you want to talk, this is your opportunity, but you don’t have to.” The court described these statements as an “age-old tactic” of detectives: sharing pieces of known information to encourage a suspect to be forthcoming with additional information. The court further noted that Detective Howland issued a complete Miranda warning and remained an “appreciable distance” from appellant during the conversation and that appellant did not ask follow up questions and appeared to understand the warning.
In assessing the validity of appellant’s waiver, the trial court considered factors *95 pertaining to knowledge, - intelligence, and voluntariness and concluded, based on the totality of the circumstances, that Detective Howland’s remarks did not invalidate appellant’s waiver. The trial court found no indication that appellant was in distress or discomfort and it observed that the combination of Detective Howland’s assurance that he could not talk to appellant unless appellant waived his rights and appellant’s ready responses to Detective Howland’s questions indicated a knowing, intelligent, and voluntary conversation. Furthermore, the court observed that appellant talked freely, chose which questions to answer and which to ignore, seemed lucid and aware of what was happening, and had no mental health issues. Accordingly, the trial court concluded that appellant made the decision to waive his Miranda rights “based on his own free will, rational thought, [and] his own intellect,” and denied the motion to suppress. Following trial, the court adjudicated appellant delinquent on all four counts. This appeal followed.
II. Discussion
On appeal from the denial of a motion to suppress on Miranda grounds, “we must defer to the trial court’s findings of historical fact as long as they are not clearly erroneous, and we must view the facts and the reasonable inferences that may be drawn from them in the light most favorable to sustaining the court’s ruling.” Dorsey v. United States, 60 A.3d 1171, 1190 (D.C.2013). However, we review the voluntariness of a Miranda waiver, a legal question, de novo. See id.; In re M.A.C., 761 A.2d 32, 38 (D.C.2000).
Miranda requires that police “adequately arid effectively” warn a suspect of his or her right to remain silent and to have an attorney present during custodial interrogation if the suspect’s statements are to be admissible at trial. 384 U.S. at 467, 86 S.Ct. 1602; Robinson v. United States, 928 A.2d 717, 725 (D.C.2007) (citation omitted). After receiving this warning, a suspect may opt to waive his or her rights. Miranda, supra, 384 U.S. at 467, 470, 86 S.Ct. 1602 (“No effective waiver of the right to counsel during interrogation, can be recognized unless specifically made after the -warnings ... have been given.”). If a suspect opts to waive Miranda rights and later challenges the admissibility of his or her post-waiver statements, the government has the burden to show that the suspect’s waiver was “made knowingly, intelligently, and voluntarily.” Di Giovanni, supra note 5, 810 A.2d at 892; see Shreeves v. United States, 395 A.2d 774, 781 (D.C.1978).
Appellant makes two arguments on appeal, which we address in. turn: (A) that Detective Howland’s pre-Miranda remarks rendered the subsequent Miranda warning ineffective as a matter of law and, consequently, that appellant’s confession must be suppressed, and (B) that his waiver of Miranda rights was.not knowing, intelligent, and voluntary. .

A. The Validity of the Miranda Warning

Appellant contends that Detective How-land’s pre-Miranda warning remarks were “embellishments” that conflicted with and confused Miranda by generally failing to convey the adversarial nature of the interaction and specifically failing to convey that the consequence of waiver may be conviction, rather than protection from the “lions.” Embellishing the warning in this way constitutes trickery, appellant continues, because the remarks falsely conveyed that appellant could not have a conversation without waiving his rights and that he would be penalized if he did not waive them. Accordingly, appellant argues that *96 Detective Howland’s pre-Miranda remarks rendered the Miranda warning that followed ineffective as a matter of law.[8]
On the facts before us, we conclude that Detective Howland’s pre-Miranda remarks did not render the subsequent Miranda warning ineffective. Appellant’s argument relies on Missouri v. Seibert, where a plurality of the Supreme Court invalidated a Miranda warning after police used a formerly common “question first” tactic, in which police would solicit a full confession, give a technically accurate Miranda warning, and then solicit the confession again. 542 U.S. at 604-06, 124 S.Ct. 2601. While Detective Howland’s pre-Mi-randa remarks cannot be construed as an instance of this “question first” tactic — a Seibert situation occurs when a suspect provides answers in response to pre-Mi-randa interrogation, a scenario that did not play out here — we have interpreted Seibert, and its predecessor Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), as quite applicable to a factual scenario similar to the one before us.[9] In Hairston v. United States, a detective entered an interrogation room and, without issuing a Miranda warning, introduced himself and informed Mr. Hairston that he faced significant charges and that the detective was interested in hearing Mr. Hairston’s side of the story. 905 A.2d 765, 770-71, 782 (D.C.2006). The detective added, however, that he “just wanted [Mr. Hairston] to listen[,]” and then proceeded to recount facts that showed Mr. Hair-ston’s involvement in the crime and played a silent video of another suspect giving a statement. Id. at 770-72. The detective asked Mr. Hairston if he wanted “any help in his case” and if he wanted to “tell his side of the story,” to which Mr. Hairston responded affirmatively. Id. The detective then issued a Miranda warning and Mr. Hairston waived his rights and confessed. Id.
*97 In upholding the detective’s tactic in Hairston, we began by reviewing Seibert and Elstad, acknowledging that the factual scenario of the “question first” tactic was different than the “just listen” tactic in Hairston, but that both cases were nonetheless instructive in determining whether pr e-Miranda warning interaction “made the Miranda warnings administered in the second session of their interaction ineffective,” and thereby contaminated a subsequent voluntary confession. Id. at 780-81. In Elstad, the Supreme Court framed the inquiry as “whether, in fact, the second [post-Miranda warning] statement was also voluntarily made.” 470 U.S. at 318, 105 S.Ct. 1285. This inquiry requires the fact finder to “examine the surrounding circumstances and the entire course of police conduct” to determine whether the suspect’s statements were voluntary. Id. “The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative.” Id. While the unwarned statement must be suppressed, “[n]o further purpose is served by imputing ‘taint’ to subsequent statements obtained pursuant to a voluntary and knowing waiver.” Id. Similarly, in Seibert, the central inquiry for the plurality was “whether it would be reasonable to find in these circumstances that the warningf] could function ‘effectively’ as Miranda requires.” 542 U.S. at 611-12, 124 S.Ct. 2601 (citation omitted) (stating that a Miranda warning must “effectively advise the suspect that he ha[s] a real choice about giving an admissible statement” and “reasonably convey that he could choose to stop talking”).
Accordingly, in Hairston, we framed our own inquiry as whether the detective’s pr e-Miranda warning interaction with Mr. Hairston “constitute^] the functional equivalent of interrogation” such that it had “a coercive impact first on Mr. Hair-ston’s decision to say ‘yes,’ he wanted to tell his side of the story, and ultimately on his decision to confess.” 905 A.2d at 780. On the facts of that case, we concluded that “the Miranda warnings as administered [to Mr. Hairston] would meaningfully apprise a reasonable suspect of his right or choice to remain silent and thus were effective[.]” Id. at 782 (brackets in original, internal quotation marks omitted) (quoting United States v. Gonzalez-Lau-zan, 437 F.3d 1128, 1138 (11th Cir.2006)). We stated, however, that such pre-Mi-randa warning interaction could very well be “the functional equivalent of interrogation” and have “a coercive effect” that overbears a suspect’s free will. Id. at 780. Yet we concluded that “nothing in the record persuades us ... that Mr. Hair-ston’s will was overborne[.]” Id. at 782 (assessing factors in the record indicating voluntariness, including Mr. Hairston’s discretionary responses, his insistence on a typewritten statement, and that he was not under age or particularly vulnerable or impaired).
In the case before us, we do not conclude that Detective Howland’s pre-Miranda remarks rendered ineffective the Miranda warning that followed. Rather, the key inquiry is whether appellant, in spite of Detective Howland’s pre-Miranda remarks, understood the Miranda warning and the consequences of waiver when he decided to waive his rights. See Hairston, supra, 905 A.2d at 782 (assessing the effectiveness and adequacy of a Miranda warning — in spite of pre-Miranda interactions — based on the totality bf circumstances, looking to see whether appellant made a knowing, intelligent, and voluntary choice to waive his rights); Seibert, supra, 542 U.S. at 613-14, 124 S.Ct. 2601 (asking whether the tactic at issue was “likely to mislead and *98 deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them”); Gonzalez-Lauzan, supra, 437 F.3d at 1139 (upholding the validity of a Miranda warning givén between' two phases of interrogation, the first in which officers told a suspect to just listen, the second in which officers solicited a confession, because “nothing in the record suggests that [the suspect’s] waiver of his rights was uninformed, coerced or involuntary”); see also Miranda, supra, 384 U.S. at 469, 86 S.Ct. 1602 (“It is only through an awareness of [the] consequences [of waiver] that there can be any assurance of real understanding and intelligent exercise of the privilege.”). That is to say, on the facts of the present case, where appellant did - not speak before receiving a Miranda warning and where he received a complete and accurate Miranda warning, our assessment of the impact of pre-Miranda remarks takes the perspective of appellant, asking whether, based on the totality of the circumstances, the pr e-Miranda remarks and the subsequent Miranda warning permitted appellant to knowingly, intelligently, and voluntarily waive his Miranda rights. See Di Giovanni, supra note 6, 810 A.2d at 892. Detective How-land’s pr e-Miranda remarks are “but one factor to be considered in the determination of whether the defendant made a knowing and intelligent waiver of his rights and that the waiver was voluntary.” See United States v. Rawls, 322 A.2d 903, 907-08 (D.C.1974) (.concluding that a police officer’s “unnecessary, embellishment on the Miranda warning” that “a lawyer would not be provided until the next day” did not, in itself, invalidate the warning). We turn to this inquiry.
B. The Validity of the Miranda Waiver; Weighing the Totality of the Circumstances
A valid waiver of Miranda rights has two distinct components: (1) it must be knowing and intelligent, “made with a full awareness of both the-nature of the right- being abandoned and the consequences of the decision to abandon it,” and (2) it must be voluntary, “the product of a free and deliberate choice rather than intimidation, coercion, or deception.” In re M.A., 33 A.3d 378, 381 (D.C.2011) (citing Berghuis v. Thompkins, 560 U.S. 370, 382-83, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010)). In assessing whether a Miranda waiver was knowing, intelligent, and voluntary, we consider “the particular facts and circumstances surrounding [the] case” and base our determination on the totality of the circumstances. Di Giovanni; supra note 5, 810 A.2d at 892 (internal quotations and citations omitted).
The “admissions and confessions of juveniles require special caution.” In re M.A.G., supra, 761 A.2d at 36 (citing In re Gault, 387 U.S. 1, 45, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)). Applying the to tality of the circumstances inquiry to the juvenile context, we consider “the juvenile’s age, experience, education, background and intelligence, the circumstances under which the statement was given, and whether the juvenile has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.” Id. (citing Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)). In addition, we may consider the juvenile suspect’s prior experience with the legal system. Di Giovanni, supra note 5, 810 A.2d at 892.
Turning to this two-part inquiry, we conclude that appellant knowingly and intelligently waived his Miranda rights, but that he did not do so voluntarily.[10]

*99
1. Knowing and Intelligent Waiver

Appellant argues that he could not have knowingly and intelligently waived his rights after receiving a “confounding and inaccurately conveyed” Miranda warning from Detective Howland. Detective How-land’s statements, appellant argues, incorrectly characterized the consequences of signing the waiver by giving appellant the option to “[s]tay silent and be thrown to the lions, or speak and be protected by Detective How[land].”[11] Thus, the “most plausible thesis,” appellant argues, is that he merely “followed] the direction of an authority figure — something juveniles are highly inclined to do” — rather than knowingly and intelligently waiving his rights.
A suspect’s waiver is knowing and intelligent when, considering the totality of the circumstances, the suspect demonstrates “awareness of the right to remain silent and [makes] a decision to forego that right.” Robinson, supra, 928 A.2d at 725 (quoting United States v. Yunis, 273 U.S.App.D.C. 290, 301, 859 F.2d 953, 964 (1988)). As a result, “the government bears a- heavy burden to show: (1) that the defendant understood [the right] ...; and (2) that the defendant intentionally relinquished or abandoned that ‘known right[.]’ ” Shreeves, supra, 395 A.2d at 781 (citations and internal quota[1] tion marks omitted); see Fare, supra, 442 U.S. at 726, 99 S.Ct. 2560 (concluding, based on the totality of the circumstances, that a juvenile suspect had knowingly and intelligently waived his rights after police officers explained that he was being questioned regarding a crime and “informed him of all the rights delineated - in Miranda, and ascertained that [the suspect] understood those rights[,]” and where the suspect provided “no indication” that he “failed to understand what the officers told him[,]” and “clearly expressed his willingness to waive his rights and continue the interrogation”).
Because our analysis takes appellant’s perspective with regard to whether the totality of circumstances indicates that he made a knowing and intelligent waiver, we begin by considering the information before him when he waived his rights. Detective Howland’s pre-Miranda remarks — namely, his references to protecting appellant from the “lions out there” who want to pin a “whole bunch of stuff” on appellant — are one-factor in our analysis. See Rawls, supra, 322 A.2d at 907-08. Following these remarks, the video recording of appellant’s interrogation establishes that Detective Howland told appellant that:
[I]n order for us to have a conversation, I have to read you your rights and you have to waive your rights. If you answer no to any of the questions I ask you after I read you your rights, that’s all, I mean, I can’t have the interview, okay?
Appellant remained silent and Detective Howland read aloud a complete and un *100 modified Miranda warning from the waiver card. Appellant affirmed his understanding of each right vocally and in writing.
The trial court made specific findings under a “totality of the circumstances” analysis after reviewing the video recording of appellant’s confession. The trial court found that Detective Howland’s pre-Miranda remarks were “just kind of so general[,]” in essence, a “very simple set of statements” that “went through Miranda in detail,” providing context for the boilerplate Miranda warning that he subsequently read from a waiver card. After Detective Howland read aloud from the Miranda waiver card, the trial court observed that he “asked about [appellant’s] rights in each of the four sections.” Appellant “appeared to understand[,]” the trial court found, and “didn’t ask any followup questions[,]” and affirmatively answered each of Detective Howland’s four confirmatory questions before signing the waiver card. The trial court also noted the absence of “any mental health concerns,” stating that appellant “seemed lucid” and “aware of what was going on.” Appellant “seemed to know particularly what he was doing, [and] seemed to want to talk about it[,]” and “certainly picks and chooses th[r]ough what he wants to answer.” As Detective Howland asked questions, appellant “didn’t really seem to have any difficulty ... indicating to the detective by not answering [that ‘]I am not talking about that subject matter.f’]”
On these findings, trial court concluded, and we agree, that appellant waived his rights using his own “rational thought” and “intellect.” While we do not condone “a police officer’s deliberate decision to withhold Miranda warnings prior to speaking with a person who is under arrest[,]” see Hairston, supra, 905 A.2d at 782, we defer to the trial court’s findings and uphold its conclusion that Detective Howland’s pre-Miranda remarks did not mischaraeterize the verbatim Miranda warning that followed. Contra, e.g., Di Giovanni, supra note 5, 810 A.2d at 894 (concluding that a police officer had invalidated a suspect’s waiver by explaining that the police officer did not think the suspect needed a lawyer and that it would be best to explain his side of the story); Lee v. State, 418 Md. 136, 12 A.3d 1238, 1250-51 (2011) (concluding that the detective’s statement “this is between you and me, bud” violated Miranda by “undermining the warning” that the defendant’s statements could be used against him). We conclude that Detective Howland accurately and comprehensively apprised appellant of his rights, see Fare, supra, 442 U.S. at 726, 99 S.Ct. 2560 and that Detective How-land’s pre-Miranda remarks, while relevant to our continued inquiry, did not prevent appellant from making a knowing and intelligent waiver, see Rawls, supra, 322 A.2d at 907-08. Left for us now is the question of whether appellant’s waiver was voluntary.

2. Voluntary Waiver

Appellant contends that Detective How-land coerced him into waiving his rights by indicating that appellant would only be protected from “the lions and the additional charges they wished to bring” if appellant waived his rights, and by suggesting that appellant would face a penalty — the additional charges — if he did not waive his rights. Appellant analogizes Detective Howland’s interrogation tactic to one employed in the Ninth Circuit case Collazo v. Estelle, where an interrogating police officer told a suspect who had invoked his Miranda rights by asking to speak with a lawyer that it “might be worse” if he did so and that it would be in his interest to proceed without one. 940 F.2d 411, 414 (9th Cir.1991). The Ninth Circuit held *101 that these statements created a penalty for exercising constitutional rights and concluded that the officer had failed to “scrupulously honor Collazo’s right to cut off questioning” and nullified Miranda’s express purpose to alleviate the “compelling pressures” of interrogation. Id. at 416-18 (citing Miranda, supra, 384 U.S. at 479, 86 S.Ct. 1602) (internal quotation marks omitted).
Miranda’s “critical safeguard” against the coercive pressures of custody is a suspect’s understanding of the right to end questioning and that law enforcement must respect this right. See Dorsey, supra, 60 A.3d at 1191 (citing Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)); see also Berghuis, supra, 560 U.S. at 386, 130 S.Ct. 2250 (stating that the suspect must be aware “that police would have to honor his right to be silent and his right to counsel during the whole course of interrogation”). Without this safeguard, “the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.” Dorsey, supra, 60 A.3d at 1191. “[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege.” Miranda, sttpra, 384 U.S. at 476, 86 S.Ct. 1602. “The test for determining the voluntariness of specific statements is whether, under the totality of the circumstances, the will of the [suspect] was overborne in such a way as to render his confession the product of coercion.” Dorsey, supra, 60 A.3d at 1203.
Bearing these principles in mind, we are keenly aware of the “special caution” required in our de novo review of the volun-tariness of appellant’s confession, given his juvenile status, and we take great care to assess the impact of subtle interrogation tactics. In re M.A.C., supra, 761 A.2d at 36 (citing In re Gault, 387 U.S. at 45, 87 S.Ct. 1428); Dorsey, supra, 60 A.3d at 1190. Our inquiry rests on many of the same factors mentioned in our “knowing and intelligent” inquiry above: we must determine whether, on the totality of the circumstances, appellant’s will was overborne by Detective Howland’s remarks and the circumstances of the interrogation. See Castellon v. United States, 864 A.2d 141, 157 (D.C.2004). Specific to the volun-tariness component, we also consider a juvenile suspect’s physical and mental condition, the duration and intensity of the interrogation, the hour at which it occurred, and any evidence of physical abuse, threats, punishment, or trickery. See In re J.F., 987 A.2d 1168, 1177 (D.C.2010) (citations omitted). A “totality of the circumstances” analysis is a subjective analysis, and we have accordingly upheld the validity of Miranda waivers on voluntariness grounds in the juvenile context where the totality of the circumstances weighed in favor of such a conclusion,[12] and invali *102 dated Miranda waivers on the same grounds where the totality of the circumstances weighed against such a conclusion.[13] .
Reviewing the factors relating to voluntariness in the record before us, we return ■ to the trial court’s findings, to which we accord deference. See Dorsey, supra, 60 A.3d at 1190. After viewing appellant’s approximately eighteen-minute video-recorded interrogation, -the trial court observed that appellant was .cuffed to the floor[14]-but appeared “relaxed” and not “under any particular distress” or “discomfort” and stated, that “[t]here’s no evidence of physical injuries[.]” The trial court found that Detective Howland “maintained an appreciable distance” from appellant and was “kind of sitting back ....' not really up on top, of [appellant].” The trial court also noted that “[t]here don’t seem to be any mental health concerns[.]” As to Detective Howland’s pr e-Miranda remarks, the trial court found that they were not “an eye-opener” for appellant; while “[o]ne might conclude[ ] that [the -pre-Mi-randa remarks] relate!] to more serious charges[,]” appellant “had to know that ... he was facing a pretty significant set of eharges[.]” Detective Howland was using an “age-old tactic of detectives[,]” the trial court concluded, in which “they have particular information and they share pieces of it” and “sometimes not even completely ... telling the truth” about the information that they know. Accordingly, the trial court concluded that this “use of trickery” did not violate Miranda and that appellant made a decision to waive his rights “based on his own free will[.]”
The question we address on review is one of tactics; namely, whether Detective Howland’s interrogation tactic of making pr e-Miranda warning statements that conveyed the gravity of appellant’s situation combined with the surrounding circumstances of the interrogation to render appellant’s waiver involuntary. As explained in Section II-Á, Detective Howland’s tactic bears some resemblance to the “just listen” tactic that we upheld in Hairston. While that tactic was quite possibly coercive from an objective standpoint, in the circumstances of Hairston we held that it did not “constitute the functional equivalent of interrogationf,]” such that its “coercive impact” rendered Mr. Hairston’s post-waiver confession involuntary. 905 A.2d at 780-82. Here, as in Hairston, Detective Howland spoke generally about the case against appellant while appellant listened and remained silent until Detective How-land issued a Miranda warning and asked appellant whether he wanted to waive his rights. Id. at 771. Also, as in Hairston, *103 Detective Howland’s remarks were, no doubt, an attempt to bolster the case against appellant to encourage him to share- his side of the story. Id. at 771-72.
Yet Detective Howland’s tactic is dissimilar to Hairston in one dispositive aspect: rather than- recounting the specific evidence implicating appellant, Detective Howland referred generally to unspecified charges that appellant would face if the “lions out there” had their way. We have previously upheld the interrogation tactic of deceiving a suspect into believing “that the evidence against him is stronger than it is.” Matter of D.A.S., supra note 12, 391 A.2d at 258. Yet such deception crosses the line to inadmissible coercion when other circumstances combine with it to “mak[e] the situation appear hopeless[.]” Id. at 259. (citations omitted). Such circumstances manifested here when Detective Howland portrayed himself as appellant’s protector from these “lions,” ostensibly referencing other people in the processing center, and stated that “everybody” — presumably the “lions” — “said ... you- did a whole bunch of stuff’ and “they’re gonna try and say that you did it all” unless appellant accepted the opportunity “to give [his] version of what happened.” In essence, by portraying himself as protector from the “lions out there,” Detective Howland supplied the reverse implication: that if appellant does not waive his rights, Detective Howland will throw him to the “lions.” Taken together, these statements seem to suggest that if appellant remained silent, he would face fabricated charges for things that he did not do,
Detective Howland did not explicitly tell appellant that “it might be worse” for him if he invoked his rights, as in Collazo, but. he strongly implied it. 940 F.2d at 414. The facts of Collazo are not directly applicable to the factual scenario before us — there, the officer’s. statement that “it might be worse” was in response to Collazo’s invocation of his right to counsel — but the legal principal of Collazo is-readily applicable. The Ninth Circuit observed that the officer’s statements “were calculated to pressure Collazo into changing his mind about remaining silent, and into talking without counsel to his interrogators” and concluded that the officer’s subsequent statement “that it ‘might be worse’ for Collazo if he did not cooperate with the police can only be seen as menacing.” Id. at 416. This statement, the court explained, was an attempt to “impose a penalty” for invoking Miranda rights, id. at 417, and we see- little difference in the nature of this post-Miranda statement and Detective Howland’s pre-Miranda statements. Telling a suspect that invoking his constitutional rights will result in adverse consequences is an “unquestionably coercive” tactic. Dorsey, supra, 60 A.3d at 1202-04 (holding that detectives violated Miranda by “exhorting [a suspect] that [asserting his rights] would work to his disadvantage while their relinquishment would benefit him”); see also United States v. Harrison, 34 F.3d 886, 891-92 (9th Cir.1994) (“[T]here are no circumstances in which law enforcement officers may suggest that a suspect’s exercise of the right to remain silent may result in harsher treatment by a court or prosecutor.”).[15] ' Here, Detective Howland’s remarks come much closer to the “unquestionably coercive” tactics in Dorsey, supra, 60 A.3d at 1203-04, than to the acceptable deception regarding the strength of the *104 evidence in Matter of D.A.S., supra note 12, 391 A,2d at 258.[16]
We emphasize the role of appellant’s juvenile status. In any custodial interrogation situation, “the seemingly benign transmittal of information to an accused may resemble the kind of mental games that largely generated the Miranda decision itself.” See United States v. Brown, 737 A.2d 1016, 1021 (D.C.1999). This warning is all the more applicable in the juvenile context, where courts must exercise “special caution” in conducting a voluntariness analysis. See In re M.A.C., supra, 761 A.2d at 36 (citing In re Gault, 387 U.S. at 45, 87 S.Ct. 1428). Even in the absence of circumstances indicating physical coercion or visible distress, we conclude that a reasonable juvenile suspect in appellant’s situation would understand Detective Howland’s pre-Miranda statements — specifically “I stand between you and the lions out there ... and they’re gonna try and say that you did it all” and “everybody said ... you did a whole bunch of stuff’— as a veiled threat to throw appellant to the “lions” who would charge appellant with other crimes unrelated to the present incident that may not even involve appellant. This statement is incompatible with the presumption of innocence. See Miller v. Fenton, 474 U.S. 104, 116, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (“[T]he admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to this suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant’s will was in fact overborne.”).[17]
*105 III. Conclusion
Considering the totality of the circumstances, with particular emphasis on Detective Howland’s references to unspecified charges that a juvenile appellant would face and his offer to stand between appellant and the “lions out there,” we cannot conclude that Detective Howland’s pr e-Miranda remarks left appellant with a “real choice about giving an admissible statement.” See Hairston, supra, 905 A.2d at 780-82 (quoting Seibert, supra, 542 U.S. at 612, 124 S.Ct. 2601). From appellant’s perspective, Detective Howland’s statements “ma[de] the situation appear hopeless” and thereby constituted coercion. See Matter of D.A.S., supra note 12, 391 A.2d at 259; see also In re M.A.C., supra, 761 A.2d at 36 (citing In re Gault, supra, 387 U.S. at 45, 87 S.Ct. 1428) (stating that the “admissions and confessions of juveniles require special caution”). Accordingly, while we conclude that appellant received an effective Miranda warning and that Detective Howland’s pre-Miranda remarks did not render the warning ineffective per se, we also conclude that appellant did not voluntarily waive his Miranda rights. We reverse the trial court’s adjudication of delinquency.

So ordered.

Opinion concurring in part and dissenting in part by Associate Judge EASTERLY.
Opinion concurring in part and dissenting in part by Associate Judge EPSTEIN.

. Appellant argues that reversal is required because the trial court committed constitutional error by admitting his confession and the government cannot show "beyond a reasonable doubt” that the trial court did not rely on this error in reaching its verdict. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The government does not argue otherwise and in fact, the trial court explicitly relied upon appellant’s confession in convicting him, stating in its findings that "[m]uch of [Ms. Dougall’s] testimony is supported by respondent’s statements to the police.” Accordingly, we cannot find that the error was harmless, and reversal is required.

.See D.C.Code § 22-2803(a)(l) (2012 Repl); D.C.Code §§ 22-3215, -1803 (2012 Repl); D.C.Code § 22-1341 (2012 Repl.); and D.C.Code § 22-407 (2012 Repl.), respectively.

. Indeed, we announce no per se rule whatsoever with regard to warnings, as our dissenting colleague suggests. See Opinion of Easterly, J., at 110-11. Instead, we specifically decline to do so, favoring a case-specific approach.

. Appellant did not respond to this question. Thus, any potential error in asking this question before issuing a Miranda warning was harmless. See Di Giovanni v. United States, 810 A.2d 887, 894 (D.C.2002).

. Specifically, appellant answered affirmatively when asked: (1) "Have you read or had read to you the warning as to your rights?” (2) "Do. you understand these rights?” (3) "Do you wish to answer any questions?” and (4) "Do you wish to answer any questions without having an attorney present?”. Appellant provided his signed waiver card with the record on appeal.

. The video' recording of appellant’s interrogation was included as part of the record on appeal.

. Appellant’s reliance on United States v. San Juan-Cruz to support this argument is misplaced. 314 F.3d 384 (9th Cir.2002). In that case, the Ninth Circuit found that there is a substantial "risk of confusion” when "a warning, not consistent with Miranda, is given prior to, after, or simultaneously.with a Miranda warning” because these multiple warnings impose an unfair burden on a suspect to "sort out” the conflict. Id. at 386-89 (concluding that such confusion existed, based on the totality of circumstances, when a suspect received two conflicting Miranda warnings on separate occasions from the same Border Patrol agent prior to interrogation, one of which did not fully state the suspect’s right to coun- • sel if he could not afford it). Even putting aside the different issues presented in San Juan-Cruz and the present case — here there was only one verbatim Miranda warning — the Ninth Circuit did not announce a per se rule that invalidates a Miranda warning as matter of law if that warning is accompanied by statements inconsistent with Miranda. Rather, it clarified that when a suspect receives two inconsistent warnings, “the onus is on the government to clarify to the arrested party the nature of his or her rights under the Fifth Amendment,” and it cautioned that the government should not presume that a suspect who has received two contradictory warnings has adequate knowledge of his or her rights. Id. at 389.

. In Elstad, the Supreme Court addressed the effect of a robbery suspect’s statement, given in response to police inquiry prior to arrest and Miranda warning, that "yes, [he] was there [at the scene of the robbery].” 470 U.S. at 300-01, 105 S.Ct. 1285. The Court suppressed this pre-warning statement but concluded that the statement had no effect on the suspect’s subsequent warned confession, holding that “a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings.” Id. at 318, 105 S.Ct. 1285. "Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect’s initial inculpatory statement, though technically in violation of Miranda, was voluntary.” Id.

. The trial court conducted a combined totality of the circumstances analysis, simultaneously assessing factors relevant to knowledge, intelligence, and voluntariness to reach an overall Conclusion. We have taken this approach in many of our cases, see, e.g., In re M.A.C., supra, 761 A.2d at 38-39, while in others we have opted to separate this analysis, see, e.g., Dorsey, supra, 60 A.3d at 1200-06, as we do in the present case.

. In particular, appellant points to Detective Howland’s statement: "I know you know why you’re up here, so I ain't gonna play the T / don’t know’ crap,” and Detective Howland’s invitation to "give your version of what happened today,” followed by the statement “I stand between you and the lions out there.”

. See In re M.A., supra, 33 A.3d at 379, 382 (concluding that a fifteen-year-old who "spoke little English" and "had no previous experience with the American legal system" had waived his rights and confessed voluntarily, in spite of a detective’s admonition that “if you value your mother, value your little sister, the best thing you can do is tell the truth,” because this statement referred to the boy’s personal interest in helping his family, not his legal interests, and because the boy "had a calm demeanor, did not manifest any reading difficulties, and did not ask for further clarification”); In re D.W., 989 A.2d 196, 203-04 (D.C.2010) (concluding that a juvenile had voluntarily waived his Miranda rights after a detective issued a warning "as soon as the officer came to be seated in the room with the [suspect],” deferring to the trial court’s findings based on a video recording of the confession showing the suspect’s “demeanor, energy level, and apparent level of under *102 standing" and that he - was unrestrained); Matter of D.A.S., 391 A.2d 255, 258-59 (D.C. 1978) (concluding that a confession was voluntary when police led a seventeen-year-old suspect "to believe that the evidence against him is stronger than it is” because he had prior experience with law enforcement, was not restrained, threatened, or coerced, was repeatedly informed of his rights, and understood those rights).

. See In re J.F., supra, 987 A.2d at 1177 (concluding that a fourteen-year-old’s -confession was involuntary because police officers, over the course of a two-hour interrogation, told him that he could not leave until he confessed, even though he had denied culpability sixty-threé times, and much of his confession simply repeated the officer's suggested version of events); In re T.T.T., 365 A.2d 366, 369 (D.C.1976) (concluding that a fifteen-year-old’s confession was involuntary, in spite of multiple valid waivers during an interview lasting approximately ten hours, after detectives pressed him to elaborate upon a prior confession after he had invoked his Miranda rights).

. The trial court stated that appellant was "hand cuffed” but the video recording shows that appellant wore an ankle cuff.

. Of course, not all forms of pressure to waive Miranda rights to avoid adverse consequences are coercive and in violation of. Miranda. See supra note 12; see also Hairston, supra, 905 A.2d at 770-72.

. Yet another factor appears to weigh in favor of involuntary waiver: although Detective Howland's interview lasted only eighteen minutes, there is some confusion as to how long appellant had been in custody at the time. Appellant's brief indicates that he was interviewed at "11:54 a.m.[,]” or nearly two hours after the crime, whereas the video recording of the interview indicates that Detective Howland stated "it’s about 11:54 p.m.” as he filled out the waiver card, placing the interview nearly fourteen hours after the crime. The waiver card provided with the record on appeal is inconclusive.

. Our colleague dissenting as to our volun-tariness conclusion suggests that whether a suspect’s will was overborne is a "fact-bound” aspect of the ultimate legal question of voluntariness, and that we are required to "defer[] to [the trial court’s] voluntariness finding” so long as the record supports it. See Opinion of Epstein, J., at 114. In support, our colleague cites to a patent construction case in which the Supreme Court relied by analogy on Miranda principles for the proposition that "[t]he answer to the legal question about the voluntariness of the confession may turn upon the answer to a subsidiary factual question[J” Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc., — U.S.-, 135 S.Ct. 831, 841-42, — L.Ed.2d - (2015) (citing Miller, supra, 474 U.S. at 112— 118, 106 S.Ct. 445).
We do not read Teva Pharmaceuticals to require the deference that our colleague suggests. This characterization blurs the distinction between factual findings and legal conclusions and would often permit the legal question of voluntariness to evade review by this court altogether. Indeed, in the same paragraph that our colleague cites, the Supreme Court stated that, in spite of the deference required, "the ultimate question of construction [here, tire equivalent question is voluntariness] will remain a legal question.” Id. at 842. The Supreme Court added that "[a]n appellate court will review die trial judge's factual determination about the alleged intimidation deferentially (though, after reviewing the factual findings, it will review a judge’s ultimate determination of voluntariness de novo).” Id. (citing Miller, supra, 474 U.S. at 112-118, 106 S.Ct. 445). Similarly, our recent opinion in Turner v. United States explained that we defer to the factual findings supported by the record, "but we do not accord comparable deference to ... the judge’s determination on the ultimate question of Brady materiality [here, the equivalent question is voluntariness]. With due appreciation for the fact-bound nature of this ulti *105 mate question, we must review it de novo on appeal.” 116 A.3d 894, 915 (D.C.2015). Thus, whether Detective Howland’s statements expressly or impliedly coerced appellant to waive his Miranda rights is a question that we review de novo.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).