# District of Columbia
# Court of Appeals

**No. 13-CF-1283**

DAVID T. ROBINSON,

Appellant,

v.

UNITED STATES,

Appellee.



FILED

JUL 14 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

CF2-20421-12

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE:  FISHER and BLACKBURNE-RIGSBY, *Associate Judges*; and PRYOR, *Senior Judge*.

## JUDGMENT

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the case is remanded to the trial court with instructions to allow appellant to withdraw his pleas, if he elects to do so.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated:  July 14, 2016.

Opinion by Associate Judge John Fisher.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-1283

DAVID T. ROBINSON, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 7/14/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF2-20421-12)

(Hon. Stuart G. Nash, Trial Judge)

(Argued February 2, 2016                          Decided July 14, 2016)

*Daniel S. Harawa*, Public Defender Service, with whom *James Klein* and *Samia Fam*, Public Defender Service, were on the brief, for appellant.

*Peter S. Smith*, Assistant United States Attorney, with whom *Vincent H. Cohen, Jr.*, Acting United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, and *Erik Kenerson*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and BLACKBURNE-RIGSBY, *Associate Judges*, and PRYOR, *Senior Judge*.

FISHER, *Associate Judge*: After entering conditional pleas of guilty to three charges involving illegal possession of a pistol and ammunition, appellant David Robinson now appeals the trial court's ruling denying his motion to suppress

statements. Robinson argues that the statement he made on May 11-12, 2012, should have been suppressed because he did not validly waive his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and that the statement he made on November 27, 2012, should be suppressed because he was subjected to custodial interrogation without being given *Miranda* warnings. We agree that the May statement should be suppressed, but decline to suppress the November statement.

## I.    Background

On January 3, 2012, Howard Sampler was shot and killed in the District of Columbia. On May 11 of that year appellant David Robinson was arrested for a violation of probation and taken to the First District police station. Upon learning of Robinson's arrest, Homicide Detective Anthony Patterson, a thirty-eight-year veteran of the Metropolitan Police Department, went to the First District interrogation room where Robinson was detained and "told him that I was investigating the murder of Howard Sampler and I believed that he had some involvement." Detective Patterson also told Robinson that "it might help him if he were to talk," but that Patterson would first "have to advise [Robinson] of his rights." When Robinson indicated he would like to talk, Detective Patterson took

him to an interrogation room on the Homicide Branch side of the building for a taped interview.

Before they entered the Homicide Branch interrogation room, Detective Patterson "may have" shown Robinson a quote on "a printout" of a Facebook page that seemed to indicate Robinson was guilty. Robinson told Detective Patterson that he shot in self-defense.

Once they were in the interrogation room, Detective Patterson read Robinson his *Miranda* rights from a PD-47 advice of rights form and then added, "[n]ow, we don't provide you a lawyer here." Robinson interjected "Yeah," and Patterson continued: "But if . . . we ask you something and you don't want to talk about it you can say look, I don't have anything to say about that. Okay?" Detective Patterson next read Robinson the first three questions on the PD-47. Robinson answered "yes" to each question, both orally and by putting a checkmark next to the corresponding "yes" on the form. Patterson deliberately omitted reading the fourth question, and Robinson did not respond to that question on the form.[1]

---

[1] The questions on the PD-47 are: "(1) Have you read or had read to you the warning as to your rights? (2) Do you understand these rights? (3) Do you

(continued…)

According to the government's proffer of facts supporting the guilty pleas, Robinson admitted to carrying a .40 caliber pistol "from one location in the Kenilworth neighborhood of Washington, D.C., to the 1500 block of 45th Street NE, Washington, D.C." and, after an altercation with Howard Sampler at that location, to firing the pistol "multiple times." Robinson claimed that he acted in self-defense.

From the time he spoke to Detective Patterson in May until late November, Robinson remained incarcerated for violating his probation. On November 27, 2012, a "couple days" after Robinson had been released, Detective Patterson both called Robinson and went to his mother's house (where Robinson was baby-sitting his two-year-old daughter) to tell him that they needed to speak. When Robinson did not come to the police station, Detective Patterson contacted Robinson and also called Sheila Cacho (the mother of Robinson's daughter). [2]

_____

(…continued)

wish to answer any questions? (4) Are you willing to answer any questions without having an attorney present?"

[2] Cacho testified that Detective Patterson left her a voicemail stating that if she did not pick up her two-year old daughter, Ryan Cacho, from Robinson's mother's house, the police would take Ryan to Child Protective Services. Detective Patterson did not recall telling Cacho "that [he] would take her daughter to Protective Services." Instead, Detective Patterson stated that the first time he called Cacho, he "asked her where Mr. Robinson was" and the second time he

(continued…)

When Detective Patterson found out that Robinson was no longer baby-sitting, he returned to Robinson's mother's house with two other officers. Robinson's mother cracked open the door and informed the officers that Robinson was not there. Insisting that Robinson was in the house, the officers pushed their way inside and, without invitation or warrant, searched for Robinson.[3] Extremely upset, Robinson's mother called him and told him that "[h]e needs to go down there and take care of it and don't come back to my house until it's done."

Robinson soon reported to the police station. Detective Patterson led Robinson through several "locked"[4] doors to an interrogation room for a second

_____

(…continued)

contacted her to ask "if she had picked up her daughter." The trial court found that Detective Patterson had "called the mother of the daughter that Mr. Robinson was looking after" and "[l]earned that . . . Ms. Cacho now had custody of the daughter."

[3] Detective Patterson testified that Robinson's mother gave the officers permission to search the house once they were inside. Robinson's mother testified that she did not give the officers permission to be in the house. The trial court acknowledged this dispute, but stated, "one way or the other he was in the house without a warrant." Although the court wondered aloud whether "there [should] be some sanction levied against the government for flouting the Fourth Amendment in that fashion," appellant did not make, and thus the trial court did not consider, an argument that Robinson's confession should be suppressed as a "fruit" of an illegal search.

Similarly, Robinson did not argue that the "cat out of the bag" doctrine should be employed to suppress his November statement as a "fruit" of the May

(continued…)

taped interview. At the end of that interview, Detective Patterson arrested Robinson.

On April 22, 2013, Robinson entered conditional pleas of guilty to carrying a pistol without a license, D.C. Code § 22-4504 (a); possession of an unregistered firearm, D.C. Code § 7-2502.01 (a); and unlawful possession of ammunition, D.C. Code § 7-2506.01 (3). In return, the government agreed not to introduce any part of the plea "in any future proceeding that may arise out of the circumstances of the death of Howard Sampler." Robinson also reserved the right to appeal the trial court's denial of his motion to suppress, *see* Super. Ct. Crim. R. 11 (a)(2).

## II. The May Interview

---

(…continued)

confession. Accordingly, any such argument is waived. *See Tuckson v. United States*, 77 A.3d 357, 366 (D.C. 2013) (citation omitted) ("It is a basic principle of appellate jurisdiction that points not urged on appeal are deemed to be waived.").

[4] Detective Patterson explained that he had to swipe his ID badge to get through "several doors" leading to "the hallway where the interrogation rooms are" and then had to put in a "code" to enter the interrogation room itself. Detective Patterson also testified that Robinson would not have been able, without assistance, to open "any of those doors" in order to leave on November 27.

Appellant first contends that the trial court erred in declining to suppress the statement he gave in May because he was not properly advised of, and did not completely waive, his *Miranda* rights.[5] We review the trial court's "legal conclusions concerning the validity of a *Miranda* waiver *de novo*." *In re M.A.*, 33 A.3d 378, 381 (D.C. 2011).

"*Miranda* requires that police 'adequately and effectively' warn a suspect of his or her right to remain silent and to have an attorney present during custodial interrogation if the suspect's statements are to be admissible at trial." *In re S.W.*, 124 A.3d 89, 95 (D.C. 2015) (citation omitted). "After receiving this warning, a suspect may opt to waive his or her rights." *Id.* (citation omitted). The accepted practice is for the police to seek "an express written or oral statement of waiver," which "is usually strong proof of the validity of that waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (2007). Even so, "an explicit statement . . . is not

---

[5] Robinson also argues that the May 11-12, 2012, questioning violated the holding of *Missouri v. Seibert*, 542 U.S. 600 (2004) (disapproving strategy of questioning first, warning later, and then asking suspect to repeat his prewarning statements). Assuming for the sake of argument that appellant preserved the *Seibert* issue, we conclude that the prewarning interaction between Detective Patterson and Robinson was not so "systematic, exhaustive, and managed with psychological skill" that there "was little, if anything, of incriminating potential left unsaid." *Id.* at 616 (plurality opinion). Nor was it "used in a calculated way to undermine the *Miranda* warning." *Id.* at 622 (Kennedy, J., concurring in the judgment).

invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel." *Id*. at 375-76. Waiver may be implied through a defendant's uncoerced statement "coupled with an understanding of his rights and a course of conduct" contrary to those rights. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (citation omitted).

"As in every waiver case, the government has the burden of showing an intentional relinquishment or abandonment of the right." *Ruffin v. United States*, 524 A.2d 685, 700 (D.C. 1987) (quoting *Brewer v. Williams*, 430 U.S. 387, 404 (1977)).

The government argues that Detective Patterson properly advised Robinson of his *Miranda* rights and that Robinson validly waived them. We agree that Detective Patterson read Robinson the *Miranda* warnings completely and accurately, and we reject appellant's argument that Detective Patterson's "embellishment" to *Miranda* (telling Robinson that "we don't provide you a lawyer here") intentionally "obfuscated" the standard *Miranda* warnings and left Robinson "uncomprehending of and inattentive to the *Miranda* right to counsel."[6]

---

[6] As far as the record reveals, any prewarning interactions between Detective Patterson and Robinson did not "obfuscate" the *Miranda* warnings.

(continued…)

As the trial court found, this additional statement was not "an impermissible embellishment of the *Miranda* rights." *See Duckworth v. Eagan*, 492 U.S. 195, 203-05 (1989) (informing suspect that a lawyer would be appointed "if and when you go to court" did not render *Miranda* warnings inadequate). Appellant was therefore properly advised of his *Miranda* rights.

---

(…continued)

Detective Patterson's prewarning actions were similar to those in *Hairston v United States*, 905 A.2d 765, 770-81 (D.C. 2006) (detective advised suspect he was under arrest for murder, expressed interest in suspect's "side of the story," shared with the suspect "some of the facts in the case that [he] was aware of," and played part of another suspect's video statement) and *In re S.W.*, 124 A.3d at 109 (detective told suspect, "*I stand between you and the lions out there . . .* they're gonna try and say you did it all . . . *in order for us to have a conversation, I have to read you your rights*."). Moreover, Robinson's un-coerced, "self-defense" comment was analogous to the voluntary "incriminating statement" made in *Oregon v. Elstad*, 470 U.S. 298, 300-18 (1985) (suspect made inculpatory remark, "Yes, I was there," in response to "unwarned yet uncoercive [police] questioning" about a neighborhood burglary after the police officer told suspect he thought he was involved).

The detectives' actions in *Hairston* and *In re S.W.* did not render ineffective the subsequent *Miranda* warnings, and the suspect's voluntary statements in *Elstad* did not taint his subsequent voluntary and informed waiver. Detective Patterson's prewarning interactions with Robinson and Robinson's unwarned admission are likewise not proper grounds for suppression.

Moreover, Detective Patterson reread to Robinson the standard advice about his right to remain silent,[7] Robinson acknowledged that he understood ("Yeah, I understand"), checked "yes" next to the second PD-47 question ("Do you understand these rights?"), and signed the bottom of the PD-47 form (below all four questions) where it says "Signature of defendant." These actions persuasively demonstrate Robinson's "awareness of the *right to remain silent* and a decision to forego *that* right."[8] *(Steven) Robinson v. United States*, 928 A.2d 717, 725 (D.C. 2007) (emphasis added). By contrast, Robinson did not expressly waive his distinct right to have a lawyer present during questioning.

---

[7] After Detective Patterson asked Robinson if he understood his rights, Robinson requested, "Could you read the second one for me again?" Detective Patterson complied: "The second one says you have the right to remain silent. You're not required to say anything to us at any time or to answer any questions. Anything you say can be used against you in court." Robinson responded, "Yeah, I understand." Robinson did not ask that any of the other rights be read again or clarified.

[8] There was no evidence that Robinson was "threatened, tricked, or cajoled into a waiver," and it is clear from the interrogation video that Robinson was willing to freely talk to law enforcement. *In re S.W.*, 124 A.3d at 101 (citation omitted). As we said in *Collins v. United States*, the video "footage allows us to visualize the events . . . in a way that would not be possible based on witness testimony alone," but that does not make us "finders of fact, nor . . . change our standard of review." 73 A.3d 974, 981 n.4 (D.C. 2013). The video does, however, corroborate the trial court's finding that "the statement provided by Mr. Robinson was voluntary."

Robinson never stated or checked "yes" after the fourth PD-47 question ("Are you willing to answer any questions without having an attorney present?") because Detective Patterson *deliberately* refrained from asking him the question. This omission is not necessarily fatal, and there is no *per se* rule precluding the government from proving a suspect's abandonment of his *Miranda* rights through a combination of express and implied waivers.[9]  However, we repeat the caveat that "if [waiver] forms are to be utilized[,] it would be the better practice to have them *completed* before questioning a suspect," *In re M.D.J.*, 346 A.2d 733, 735 (D.C. 1975) (emphasis added).  When conducting our *de novo* review, this court is entitled to be skeptical in a case like this, where an officer deliberately pursues some express waivers but purposefully fails to complete the PD-47, relegating the government to arguing that there was an implied waiver of a key right.

---

[9] In *North Carolina v. Butler*, for example, the suspect expressly waived his right to silence when he stated, "I will talk to you but I am not signing any form." 441 U.S. at 371.  Because the suspect did not sign the "Advice of Rights Form," the key remaining question was whether, through his actions, he had also implicitly waived the right to the presence of a lawyer. *Id.* at 374.  The Supreme Court remanded that question to the North Carolina Supreme Court, acknowledging that "there is no reason in a case such as this for a *per se* rule . . . that no implicit waiver can ever suffice." *Id.* at 369.  Thus, while the Supreme Court made clear that the government might be able to prove waiver of *Miranda* rights through a combination of express and implied waivers, it did not determine whether Mr. Butler had in fact validly waived his right to presence of counsel and, in turn, whether the statements were admissible. *Id.* at 376.

That skepticism is enhanced in the instant case, where Detective Patterson apparently did not appreciate the distinction between PD-47 question three ("Do you wish to answer any questions?") and question four ("Are you willing to answer any questions without having an attorney present?"). There is, however, a clear difference. A defendant could logically say "yes" to questions one through three but "no" to question four, and this in fact has happened. *See, e.g.*, *(Tony) Thomas v. United States*, 731 A.2d 415, 419 (D.C. 1999); *Smith v. United States*, 529 A.2d 312, 314 (D.C. 1987) (police officers "surprised" when suspect answered "no" to the fourth question although he had previously seemed eager to speak and had checked "yes" in response to the third question).

Detective Patterson's justification for skipping the fourth PD-47 question was that, "I'd already told [Robinson] that he was not going to have a lawyer present during questioning. Once he agreed to talk to me I didn't see any point in asking him if he wanted to talk to me without a lawyer present." This reasoning overlooks one of the fundamental "points" of *Miranda* – that Robinson, although willing to answer questions, had a right to have an attorney present while doing so.

Detective Patterson's previous comment to Robinson that he would not be provided with a lawyer at the police station does not change the analysis. Of

course, a suspect's willingness to answer questions at that time and place despite being told that a lawyer would not be present during questioning *might* seem to indicate, as a matter of strict logic, that the suspect was willing to talk without a lawyer. Still, simply to assume that, because Robinson said he wished to answer questions, he also was willing to answer questions without an attorney present, subverts *Miranda*'s holding that these are distinct rights.

Detective Patterson's failure to appreciate this distinction produces the obvious concern that Robinson did not intentionally abandon his right to have counsel present during questioning. That concern easily could have been addressed by asking the next question on the list and obtaining a direct response. Although *Berghuis* recognizes that a defendant can validly and impliedly waive his right to have counsel present, 560 U.S. at 384, we reject the argument that Robinson did so here, an assertion based solely on his explicit answers to the first three PD-47 questions. Because the government did not carry its burden of proving that Robinson "intentionally relinquished . . . [his] 'known right'" to have counsel present during questioning, Robinson's May statement should be suppressed. *Di Giovanni v. United States*, 810 A.2d 887, 892 (D.C. 2002) (citation omitted).

### III.    The November Interview

Appellant argues next that the trial court should have suppressed his November statement because he was subjected to custodial interrogation without being read his *Miranda* rights.  "We review *de novo* the trial court's legal conclusions as to whether the defendant was in custody and whether the facts established a *Miranda* violation."  *Resper v. United States*, 793 A.2d 450, 456 (D.C. 2002) (citation omitted).  "If the defendant is not in custody[,] then [*Miranda* and its progeny] do not apply."  *In re A.J.*, 63 A.3d 562, 566 (D.C. 2013) (citation omitted).

When analyzing a *Miranda* issue, the term "custody" properly applies "only [to] those cases in which there has been a 'formal arrest or restraint on freedom of movement *of the degree associated with a formal arrest.*'"  *In re A.J.*, 63 A.3d at 566 (citation omitted).  Stated another way, "where the overall tenor of the situation would cause a reasonable person to believe he or she is under arrest . . . . [or w]hen an encounter becomes dominated by police authority, . . . the Fifth Amendment may require" officers to advise suspects of their constitutional rights.  *In re I.J.*, 906 A.2d 249, 260 (D.C. 2006).  Judicial review of a police-citizen encounter should focus both on what police do and "also what they say" because

"[c]ommunications from the police to the suspect . . . may assuage the reasonable person's assessment of the situation." *Id.*

Despite the persistence of the police in urging Robinson to come to the station for another interview, he was not in custody. Robinson's friend Britney drove him to the station and, once he was there, his movement was not restrained to the degree associated with a formal arrest. He was not physically restrained and the door to the interview room initially was propped open. Although the door was closed as the interview began (and several locked doors stood between Robinson and the outside world), these same conditions "apply to any witness who comes back to one of those interview rooms."

The environment was not so highly coercive as to be custodial. Early in the interview, Detective Patterson told Robinson that "if you want to leave here, if you decide you don't want to answer any of our questions, you can leave." Revealing that he understood, Robinson responded, "[L]ike you said, if any time I feel like I don't want to answer, I'll just go ahead and tell you." Detective Patterson further informed Robinson that "you aren't under arrest" and that the interview would take "[p]robably about an hour." Detective Patterson then agreed to coordinate with

Britney on Robinson's behalf, telling her that she could leave if the interview took longer than an hour.

Late in the interview Robinson asked if he could leave and stated he did not want to talk, but he did not attempt to leave, and he admitted that he did not "want to go out [of] here without everything being understood." By this point, moreover, Robinson had already communicated more than enough details to support the gun and ammunition charges.

These facts compare favorably to those in *Spencer v. United States*, 132 A.3d 1163, 1168-69 (D.C. 2016). In *Spencer*, a suspect was transported to the police station in the back of a locked police car (which only the officer could open), frisked prior to entering the car, and never left alone after his arrival at the station. *Id.* at 1168. He was escorted by a police officer when he asked to use the bathroom and smoke a cigarette. *Id.* Despite these restrictions on the suspect's movement, this court held that he was not in custody for purposes of *Miranda* because (1) the police officers told him that he was not under arrest, (2) he was not handcuffed, and (3) the interactions between the suspect and the officers were cordial. *Id.* at 1168-69 ("Lack of physical restraint can create strong indicia of lack of custody.") (citing *Morales v. United States*, 886 A.2d 67, 72 (D.C. 2005)).

We similarly conclude that Robinson was not in custody on November 27, and the police did not violate *Miranda* by questioning him without advising him of his rights.

## IV.    Conclusion

The two interviews of appellant contain duplicative information about his possession of a firearm and ammunition.  Thus, had Robinson been convicted after a trial, we would consider an argument that admitting evidence of the first interview was harmless.  However, Super. Ct. Crim. R. 11 (a)(2) provides that "[a] defendant who prevails on appeal shall be allowed to withdraw the plea."  The rule does not specify what happens when a defendant prevails only in part.

This court has not squarely addressed that question (and we do not do so here).  However, we have noted the statement of one court that "[i]f *any* ruling that forms a basis for the conditional plea is found to be erroneous, we are required to permit the defendant to withdraw his plea."  *(Tony) Thomas*, 731 A.2d at 429 & n.24 (quoting *United States v. Mejia*, 69 F.3d 309, 317 n.8 (9th Cir. 1995)).  Because the plea agreement in this case did not purport to limit this right, and the

parties have not fully briefed the underlying issue, we apply Rule 11 (a)(2) literally and remand the case to the trial court with instructions to allow Robinson to withdraw his pleas, if he elects to do so.

*It is so ordered.*