*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-1350

LEJEEZAN TOUDLE, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-7876-15)

(Hon. Todd E. Edelman, Trial Judge)

(Argued April 12, 2017                                     Decided July 5, 2018)

*Benjamin Miller*, Public Defender Service, with whom *Samia Fam* and *Mikel-Meredith Weidman*, Public Defender Service, were on the brief, for appellant.

*Sharon A. Sprague*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman, Suzanne Grealy Curt*, and *Tamika Griffin Moses*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, THOMPSON, *Associate Judge*, and RUIZ, *Senior Judge*.

THOMPSON, *Associate Judge*:    A jury convicted appellant Lejeezan Toudle of unlawful possession of a firearm (felon in possession); carrying a pistol without a license outside a home or business ("CPWL"); and possession of an unregistered

firearm. In this direct appeal, appellant challenges the trial court's denial of his motion to suppress statements he made during his post-arrest custodial interrogation. He primarily argues that statements his interrogators made during his interview subverted the advice they had earlier given him about his *Miranda* rights,[1] invalidated the waiver he had made of those rights, and resulted in a confession that was inadmissible. He also contends that the investigators' tactics rendered his confession involuntary. Although we agree that improper statements by an interrogator after a suspect has heard, understood, and waived his *Miranda* rights may, in the totality of circumstances, invalidate the waiver prospectively, we are persuaded that this is not what occurred in this case.[2] We are also satisfied that appellant's confession was voluntary. Accordingly, we affirm.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] The Supreme Court explained in *Miranda* that "[i]f [an] interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475. We assume without deciding that the government also bears a heavy burden to show that a *Miranda* waiver was not vitiated by interrogators' conduct. "[T]he burden is [also] on the government to prove by a preponderance of the evidence that a defendant's statements were made 'freely, voluntarily, and without compulsion or inducement of any sort.'" *In re J.F.*, 987 A.2d 1168, 1177 (D.C. 2010) (quoting *Haynes v. Washington*, 373 U.S. 503 (1963)).

## I. Background

The relevant facts are as follows. In the afternoon of June 9, 2014, Metropolitan Police Department ("MPD") officers responded to a "look[-]out for an individual who was possibly carrying a firearm" at 16th Street and Kalorama Road, N.W. Upon arriving at a location in the 2400 block of 16th Street, N.W., one of the officers observed appellant, who fit the look-out description, walking northbound on 16th Street. As the officers, who were in uniform and driving a scout car, parked and began to exit the car, appellant noticed them, and he fled before they had a chance to speak with him. The officers followed on foot.

During the chase, appellant turned into a parking lot and stopped at the rear of a vehicle, where an officer who had caught up with him saw appellant "ducking down almost to conceal himself . . . ." The officer testified to seeing appellant "move his arm . . . away from [his] body and towards the [vehicle]" and then hearing "the sound of a metal object hitting the ground."[3] Appellant fled again, this time tripping and falling shortly upon taking flight. The officers apprehended and detained appellant and, upon returning to where the vehicle was parked, found

---

[3] No other witness testified to seeing appellant with a gun, and the only fingerprints found on the gun belonged to someone else.

a firearm beneath the vehicle.  The officers then arrested appellant for possession of the firearm.

At the police station, Investigators Elias Danho[4] and James Gamble interviewed appellant.  The video recording of that interview, which we have reviewed, shows appellant arriving into a small room, where the investigators undo his handcuffs and chain his feet to the floor.  The substantive interview began with Investigator Gamble telling appellant:

> [D]on't say anything yet, but you're looking at a felon in possession of a firearm charge . . . .  So today, because you're a felon, it's a felon in possession of a firearm.  It's a little more serious . . . . So this is your chance to kind of roll me through what's going, what happened out there . . . . So let me read you your rights, you think about . . . what we gonna talk about and then you let me know what we're gonna do[,] okay?

Appellant nodded.

Thereafter, Investigator Gamble read appellant his *Miranda* rights from a form as appellant, looking at the form, followed along.  Once he finished reading, Gamble asked appellant whether he had any questions (a question appellant

---

[4]    The interview transcript mistakenly identifies Investigator Danho as Investigator "Daniel."

answered by "shak[ing his] head no") and whether he understood his rights. Appellant responded that he did. When Investigator Gamble then asked appellant whether he "wish[ed] to answer any questions," and appellant responded, "No," Gamble stated, "All right. That's it then."

As the investigators begin gathering their materials to leave the room, appellant inquired, "How I got charged with a gun?" Gamble responded, "Well[,] I'm not gonna answer your questions if you're not gonna answer mine[]." Appellant replied, "I mean I'll answer questions. I ain't got no problems answering no questions." Gamble then retrieved a new *Miranda* form, reread appellant his rights, and asked the required questions again. This time, appellant agreed to answer questions outside the presence of an attorney.

The investigators then questioned appellant over a period of about an hour and fifteen minutes (interrupting the interview at one point after appellant said that he needed to use the restroom). The investigators began by asking appellant to explain "why [he] started running" when officers arrived. Appellant first said that he did not know that the men who approached him were officers, even though they were in uniform. When Investigator Gamble again asked why appellant had run, appellant eventually explained that he and the man he was with when officers

arrived were in the area because that man, whom he did not really know, had asked appellant to give him a ride to an apartment building there. Appellant said that he had no idea what the other man was planning to do at the building. Appellant continued, "So then — so we couldn't get in the building . . . . So when we start walking back off[,] he was just like, man run. I don't know what he had did. When the police had pulled up[,] and he was like run, I just ran. That was it."

When Investigator Gamble told appellant that the other officers had reported that appellant had a gun on him, appellant denied that he had a gun (saying instead, "I had a knife on me, man."). In response, the investigators told appellant that his denials were "not gonna cut it." Appellant responded, "I already know it ain't gonna cut it right here." Investigator Gamble urged appellant to provide "a reason" why he had the gun, such as "someone's out for me," suggesting that "maybe they can work with that." Gamble told appellant that if he were to go "in front of th[e] judge and say, I didn't have a gun on me, . . . they're gonna look at [appellant's prior convictions for] armed robbery, previous arrest with the gun, [and the] officer saying [appellant] had the gun," and appellant would be "done. Right?" Appellant agreed, saying "Um hmm." Appellant also agreed with Gamble's observation that the gun made it look like he was "there about to rob

somebody again" and acknowledged that "[w]ith my background[,] [the judge or jury] gonna believe [what the officers have to say]."

Throughout the interview, Gamble suggested that appellant's possession of the gun had already been established, stating at one point, "[W]e don't really need to talk. Because from what they're telling me[,] they got you." Gamble further told appellant, "I'm not even trying to get you to say, yeah[,] I had a gun, because we know you had a gun. I'm trying to figure out why you had a gun." Gamble told appellant that the investigators "need[ed] to hear a reason," such as that appellant had "an ex-girlfriend . . . who [had] threatened" him, or that appellant's friend "handed [him] a gun" and "said hold this for a second," or that appellant "needed a gun [be]cause he thought [other people] were gonna kill him . . . . [or that] [t]hey might even go kill his grandma . . . ."

The investigators also told appellant that this was his chance to "lessen the damage" by informing them of the reason for his possession of the gun. Investigator Gamble told appellant that if the person to whom he had given a ride "did something wrong up in that apartment[,] you're facing that too."

When appellant continued to deny possession of the gun (he asserts that he did so "twenty times"), Gamble finally stated, "All right[,] man. I mean, we don't want to keep going round and round with you, but you got — this is it. I don't think we have much more. So you sure? You don't want to go over this story one more time from the beginning?" This time — just after telling Investigator Danho (who had stood after telling appellant that the investigators would "give [him] a few minutes") to "sit down" again — appellant confessed. Appellant told the investigators that he and the man to whom he had given a ride went to the building to "sell the gun to somebody,"[5] and that because "the [other man's] shirt . . . was too small" or "too short" to conceal the gun, appellant "held the gun" ("just grabbed [the gun] and tucked it" in his jeans) for the other man. Appellant said that the gun had a "wood handle" and stated that the gun must have fallen out of his pants when he tripped and fell during his flight from the officers. Shortly after appellant made that statement (at approximately 6:43 p.m.), the interview ended.

---

[5] Specifically, appellant stated, "He told me we was gonna go up there and sell the gun to somebody. So, that's what we was doing."

## II.  Appellants Contentions and the Standard of Review

Appellant contends that the trial court erred in ruling that his confession was admissible and in denying his motion to suppress.  He asserts first that "when police administer proper *Miranda* warnings and secure a valid waiver . . . but then contradict or undermine the warning, any subsequent statement is inadmissible," because "a suspect who is misinformed about the consequences of foregoing his right[s] . . . cannot have knowingly, intelligently, and voluntarily waived that right . . . ."  He argues that this is what happened here:  that statements by Investigators Gamble and Danho contradicted and undermined the *Miranda* warning, rendering appellant's prior waiver ineffective with respect to the statements he made toward the close of the interview.  Appellant also argues that the interrogators' tactics rendered his confession coerced and involuntary.

The facts of what occurred during the interrogation, captured on video and transcript, are not in dispute.  Appellant's claims raise entirely legal issues, as to which our review is *de novo.  See Dorsey v. United States*, 60 A.3d 1171, 1190 (D.C. 2013) (en banc) ("[O]ur review of the trial court's legal conclusions is *de novo.*"); *see also id.* at 1190 ("[W]hether [the defendant] validly waived his Fifth

Amendment rights and voluntarily confessed" "is a legal question subject to our *de novo* examination.").

### III. Analysis

"The rights expressed in the *Miranda* warning pertain throughout the interrogation." *Lee v. State*, 12 A.3d 1238, 1246 (Md. 2011); *see also Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010) (explaining that the interrogation process "provides the suspect with additional information that can put his or her decision to waive, or not to invoke, into perspective"). Thus, where a suspect says that he will no longer talk and that he wants a lawyer, *Miranda* requires the authorities to stop the interrogation cold, even after initially obtaining a valid waiver. *See* 560 U.S. at 388 ("If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease."). "[T]he individual's right to choose between silence and speech [must] remain[] unfettered throughout the interrogation process." *Miranda*, 384 U.S. at 469. This court and others have recognized that this means that "the interrogator may not say or do something during the ensuing interrogation that subverts th[e] [*Miranda*] warnings and [prospectively] vitiates the suspect's earlier waiver by rendering it unknowing, involuntary, or both." *Lee*, 12 A.3d at 1241, 1250–51 (holding that an officer's

statement that the interrogation is "between you and me" subverted the *Miranda* warning that any statement the suspect makes "can and will be used against" him, "rendering in violation of *Miranda* all statements the suspect thereafter made during that interrogation").[6] This court found a vitiation of a prior waiver in *Di Giovanni v. United States*, 810 A.2d 887 (D.C. 2002). The opinion in that case recounts that when suspect Di Giovanni asked the police sergeant "whether he needed a lawyer at that point in time[,]" the sergeant "responded that he would need one later, but that at that time he did not think Di Giovanni needed one" and that "it would be best if [Di Giovanni] told [his] side of the story." *Id.* at 890. We concluded that "in the totality of the circumstances, [the sergeant's] embellishments and directives that Di Giovanni didn't need a lawyer vitiated the validity of his waiver." *Id.* at 894.

---

[6] *See also, e.g.*, *Moran v. Burbine*, 475 U.S. 412, 422-23 (1986) (for a waiver to be valid, the suspect must be "aware of the State's intention to use his statements to secure a conviction"); *Hart v. Attorney Gen. of Fla.*, 323 F.3d 884, 894-95 (11th Cir. 2003) ("Telling [the suspect] that 'honesty wouldn't hurt him' contradicted the *Miranda* warning" and rendered his waiver "not voluntary, knowing, and intelligent as required by *Miranda* . . . ."); *Hopkins v. Cockrell*, 325 F.3d 579, 585 (5th Cir. 2003) ("An officer cannot read the defendant his *Miranda* warnings and then turn around and tell him that despite those warnings, what the defendant tells the officer will be confidential and still use the resultant confession against the defendant.").

Here, similarly, we agree with appellant's argument that when an interrogator or interrogators make statements during a post-waiver interrogation that are contrary to what the suspect was told when he was read his *Miranda* rights and agreed to talk to the police without counsel, those statements may, in the totality of the circumstances, effectively nullify the waiver and render inadmissible any statements the suspect makes from that point on. The issue we confront is whether, in the totality of circumstances, that result ensued from appellant's custodial interrogation by Investigators Gamble and Danho. The totality of the circumstances includes, *inter alia*, a suspect's "prior experience with the legal system, evidence of coercion or trickery, cognitive ability . . . [, and the] delay between arrest and statement." *Robinson v. United States*, 928 A.2d 717, 725 (D.C. 2007).

Appellant points to several statements made by the investigators that he contends undermined the *Miranda* warnings and vitiated his waiver. Below, we consider the statements in the context of the totality of circumstances to determine whether any of the statements, by themselves or in combination, had that effect and rendered appellant's waiver ineffective.

## A. Whether appellant's *Miranda* waiver was vitiated

### 1. Appellant's background and the interrogation conditions

The record indicates that at the time of his interrogation, appellant was thirty-one-years-old, had a criminal history that included convictions for robbery and CPWL, and, as he told the investigators during the interrogation, had "been locked up before" and was "familiar with the system." Prior to the interrogation, appellant had not "been drinking or smok[ing] anything." After entering the interview room, appellant placed his arms inside the torso section of his short-sleeved T-shirt (as if for warmth) and held them there for most of the interview, but seemed relaxed[7] and exhibited no signs of physical or mental distress during the interview.[8] Officers had encountered and arrested appellant at approximately 2:42 p.m., and Investigators Danho and Gamble began interviewing appellant at approximately 5:28 p.m. the same day, ending the interview approximately one hour and fifteen minutes later, at 6:43 p.m. Several times during the interview —

---

[7] During the interview, Investigator Gamble was generally leaned back in his chair, also exhibiting a relaxed demeanor, and Investigator Danho was seated in an adjacent chair, with one leg crossed over the other. He, too, appeared relaxed.

[8] Although appellant stated at the end of his interrogation that he was having trouble breathing (and the investigators told him they would get him an ambulance if he needed one), he exhibited no signs of physical distress while in the interrogation room. Prior to the interview, appellant was taken to the hospital, where, according to appellant, the doctors informed him that he had not sustained any injuries to his back.

including just before he confessed — appellant took long pauses before answering the interrogators' questions, apparently taking his time to think through the implications of his decision about what to say and whether to answer the investigators' questions (as if performing his "own balancing of competing considerations," *State v. Owens*, 643 N.W.2d 735, 751-52 (S.D. 2002)). Throughout the interview, the investigators never raised their voices, and they accommodated appellant's request to use the bathroom. Appellant was informed that he was "under arrest" and was read his *Miranda* rights (twice), and he told the investigators, "I understand my rights, man."

We can discern nothing in the foregoing context and circumstances that gives us concern that appellant did not understand his rights at the time he confessed. We now go on to consider the investigators' statements and appellant's arguments based on them.

### 2. Statements that appellant contends disparaged his right to have counsel present during the interrogation

Appellant argues that the interrogators subverted the *Miranda* warning by disparaging his right to counsel. He focuses on the following statements by Investigator Gamble:

> If you get to court and your defense attorney stands up there, who they're not gonna believe anyway. He says well, someone was threatening his life. He needed a gun 'cause he thought they were gonna kill him. They — they said they were gonna kill him. They might even go kill his grandma. They not gonna believe it then. At that point[,] it's too far gone.

Appellant variously characterizes those remarks as "a 'directive that [he] didn't need a lawyer,' and that he would be better off speaking right then without counsel"; as advice "that he would put himself at risk if he waited to talk to his attorney"; as a "'one-sided, unauthorized legal opinion' that [he] should *not* 'remain silent and exercise his right to counsel'"; as a warning that "'invoking the right to counsel would come at a price'"; and as statements that told appellant that "reliance on an attorney would be futile." Appellant contends that through these remarks, the investigators "methodically undermined" the *Miranda* rights of which he had been advised. He asserts that the investigators' conduct was geared toward making him believe that "relying on an attorney . . . would be a grave mistake."

We do not agree that the investigators disparaged the right to counsel or that their statements otherwise contravened "the principles the *Miranda* rights were designed to protect." *Miranda* is "concern[ed] . . . primarily with th[e] interrogation atmosphere and the evils it can bring." *Miranda*, 384 U.S. at 456.

The reading of a suspect's *Miranda* rights is designed to combat the pressures of in-custody interrogation, so as "to permit a full opportunity to exercise the [Fifth Amendment] privilege against self-incrimination." *Id.* at 467. The *Miranda* Court also recognized, however, that "[t]he circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators." *Id.* at 469. The Court therefore decreed that "the right to have counsel *present at the interrogation* is indispensable to the protection of the Fifth Amendment privilege . . . ." *Id.* at 469 (emphasis added). Thus, the right to counsel that *Miranda* protects is the "right to consult with counsel prior to questioning[] [and] to have counsel present during any questioning if the defendant so desires." *Id.* at 470.

Here, the investigators' challenged statements concerned the effectiveness of the arguments that might be made by the attorney who would be appellant's trial counsel (pursuant to his Sixth Amendment right to counsel). The investigators' statements were to the effect that, at trial, the fact-finder would be unlikely to believe a gun-possession-in-self-defense theory mentioned by counsel for the first time during trial, after appellant, in answering the interrogators' questions, had

denied having a gun at all.[9]  The investigators did not, as appellant's argument implies, suggest to appellant that it would be a "grave mistake" to rely on an attorney during interrogation or that appellant would do better without counsel during interrogation.  That fact distinguishes this case from *Collazo v. Estelle*, 940 F.2d 411 (9th Cir. 1991) (en banc), on which appellant relies.  Collazo refused "to waive [his *Miranda* rights], asking instead to talk to a lawyer," making him "a suspect who . . . indicated his inability to cope with the pressures of custodial interrogation by requesting counsel."  *Id.* at 413, 418.  The Ninth Circuit reasoned that the officer who interrogated him, who told him that "it might be worse for" him if he talked to an attorney, had "demeaned the pre-trial role of counsel . . . by dispensing a one-sided, unauthorized legal opinion regarding whether Collazo should remain silent and exercise his right to counsel" and "inappropriately led Collazo to believe he could reap some legal benefit by excluding defense attorneys from the pre-trial process."  *Id.* at 414, 418.  The instant case is also unlike *Hart v. Attorney Gen. of Fla.*, 323 F.3d 884 (11th Cir. 2003), in which the interrogators purported to explain to suspect Hart "the disadvantage of having a lawyer present" during the interrogation.  *Id.* at 894.

---

[9]  Appellant told the investigators that he "already kn[e]w" that "with [his] background," "they [the judge or jury] gonna believe . . . all" an officer witness would say about appellant's having had a gun.

We also reject appellant's argument that his waiver of his *Miranda* rights was undermined by the investigators' statements to the effect "that he 'need[ed]' to confess 'now'" (a statement appellant argues was "a direct repudiation of the *Miranda* warning"). This case is materially different from *People v. Dunbar*, 23 N.E.3d 946 (N.Y. 2014), another case on which appellant relies. There, officers made the statements in question (e.g., "this is your opportunity to tell us your story") as part of a "scripted preface" or "'preamble' to the *Miranda* warnings," which was read before suspects had agreed to waive their rights and answer questions. *Id.* at 947. Here, by contrast, the investigators' statements to appellant were made after he had said he had "no problem" answering questions without counsel present. In addition, the investigators' statements focused not on remaining silent vs. speaking with the investigators without counsel, but instead on the credibility of any reason for having the gun appellant might later give at trial, compared to the credibility of an explanation provided during the interview. We do not discern that the investigators' statements were in derogation of appellant's "ongoing right to remain silent" or that the statements contradicted appellant's right to "request the assistance of counsel at any time."

We conclude, in short, that none of the investigators' statements highlighted by appellant implicated his right to consult with counsel before being interrogated

or to have counsel present during the interrogation and that the statements in combination also did not do that. Accordingly, we cannot conclude that the interrogators subverted their earlier message apprising appellant of his *Miranda* rights by disparaging the right to counsel that *Miranda* protects.[10]

### 3. Statements about additional criminal charges

Appellant also contends that the investigators threatened him with "additional charges" through statements that appellant argues subverted the advice about his *Miranda* rights. He highlights the following statements:

> Because I can tell you right now, if he did something wrong up in that apartment[,] you're facing that too. I mean, if they find a body or something up in that apartment, guess what you're facing, a homicide charge.

> [The other man] could [have] just robbed somebody, or beat somebody up? I mean, I — I'll be waiting for the radio to come out later on tonight saying they found a body up in that apartment . . . . And I'll say, well guess who we gonna be charging with that?

---

[10] We also cannot say that the investigators' statements that drew appellant's attention to the likely ineffectiveness of any defense he might raise for the first time at trial, without focusing him on the "tactical advantages of having an attorney present" during his interrogation, undermined the validity of his *Miranda* waiver. *See Di Giovanni*, 810 A.2d at 892 (stating that "a knowing and intelligent waiver [of *Miranda* rights] does not necessitate an understanding of the tactical advantages of having an attorney present or otherwise invoking *Miranda* rights").

> Actually, we're gonna dig so hard[,] we're gonna find out
> who that gun belonged to, if there are any bodies on that
> gun, we're gonna dig.

Relying on this court's opinions in *In re S.W.*, 124 A.3d 89 (D.C. 2015), and *Little v. United States*, 125 A.3d 1119 (D.C. 2015), appellant contends that the foregoing statements rendered his *Miranda* waiver invalid because they suggested that "if appellant remained silent, he would face fabricated charges for things that he did not do."

We are not persuaded by appellant's analogy to those cases or by his argument more generally. In *S.W.*, the critical fact was that, prior to even reading the juvenile suspect his *Miranda* rights, the interrogating detective told him, "I stand between you and the lions out there . . . . [W]e have a lot of things going on out there, and they're gonna try and say that you did it all." 124 A.3d at 94. Calling these statements "veiled threat[s]," we observed that "rather than recounting the specific evidence implicating appellant, [the] Detective . . . referred generally to unspecified charges that appellant would face if the 'lions out there' had their way." *Id*. at 103. We concluded that the statements were improper because they "suggest[ed] that if appellant remained silent, he would face fabricated charges for things that he did not do." *Id.* Similarly, in *Little*, we

concluded that the defendant's confession was involuntary because it followed the detectives' repeatedly "scar[ing] Mr. Little with the prospect of being falsely accused of unrelated robberies, perhaps a lot of them[,]" 125 A.3d at 1132, "offenses they openly indicated they did not suspect him of committing," if he did not confess to a carjacking. *Id.* at 1127.

Here, by contrast, we conclude that the statements the investigators made about potential, additional charges were not improper because they threatened neither "fabricated" charges nor "unspecified" charges unconnected to the offense for which appellant had been arrested. *S.W.*, 124 A.3d at 94. Rather, the investigators' comments specifically cautioned appellant, an adult who was "familiar with the system," that through lab work the police would find out to whom the gun actually belonged. The statements apprised appellant of the potential, in light of the officer's report that appellant had been in possession of the gun they recovered and had fled from police, that he could be charged with a while-armed homicide, robbery, or assault if, after "digging," evidence of any such offense tied to the gun was found in the apartment building from which appellant had fled. The officers did not threaten to fabricate charges or to charge appellant with any of the "lot of things going on out there," *S.W.*, 124 A.3d at 94; rather, they let him know that he realistically faced an investigation that might tie him to other

crimes, if any, found to be connected to the firearm. As we recognized in *S.W.*, "[c]onvey[ing] the gravity of [a suspect's] situation" by reference to specific charges in which appellant may be implicated during a post-waiver interrogation does not violate *Miranda* or vitiate a suspect's "decision to waive his right based on his own free will." *Id.* at 102-03 (internal quotation marks and brackets omitted).

**4. Statements that appellant asserts were to the effect that honesty would not hurt, or that he could "help himself" by making an incriminating statement, and that appellant argues contributed to the invalidity of his waiver by "obscur[ing] . . . the consequences of forgoing his privilege against self-incrimination"**

Appellant asserts that "the investigators methodically undermined [the statement of his] rights by telling him that the only way he could help himself was by providing an incriminating statement to police"[11] and that their statements to him "went far beyond the improper advice in *Hart* that 'honesty wouldn't hurt' . . . ." He contends that the investigators' statements "[f]latly contradict[ed] the *Miranda* warning's message that anything he said could be used against him."

---

[11] Specifically, the investigators told appellant: "[*T*]*his is the point* where we need some honesty from you" (emphasis added). "[T]he only way you gonna be able to help yourself out . . . is that you sat down in this room and you were honest . . . ." "[N]ow is the time to tell me." "This is the last chance we're gonna believe you, where you can be honest . . . ." "[W]e need to hear that from you. And you need to — we need — we need to hear some honesty about it." "[Y]ou need to tell us . . . . You need to make me believe you . . . ."

We do not agree that the investigators' statements conveyed (or would reasonably have caused appellant to believe) that "honesty wouldn't hurt." *Hart*, 323 F.3d at 894. To begin with, the investigators never suggested to appellant that he could avoid prosecution and escape penalty if he confessed. Quite the contrary, as discussed above, the investigators let appellant know that he faced serious charges and that "first of all[,] there's no getting out of this, you['re] on the hook." Appellant agreed that he "kn[e]w what [he was] facing" and at one point said "[a]bout ten more years, man[,]" (seeming to imply that he knew that this would be the potential period of prison time he would face after having "just been there and done six years"). He told the investigators that whether he said that he did not have the gun or said that he had it "for whatever reasons," "[t]he shit not gonna help me . . . . You see what I'm saying?" (but agreed that he "need[ed] to be looking to lessen the damage"). He also told the investigators that he was "still gonna do the protocol, process, regardless," and they agreed, saying, "Yeah, you gonna be going through . . . the process, ain't no doubt about that."

We therefore reject appellant's efforts to liken the investigators' statements to those at issue in *Hart*. In *Hart*, the Eleventh Circuit observed that "[t]he phrase 'honesty will not hurt you' is simply not compatible with the phrase 'anything you

say can be used against you in court,'" reasoning that "[t]he former suggested to Hart that an incriminating statement would not have detrimental consequences while the latter suggested (correctly) that an incriminating statement would be presented at his trial as evidence of his guilt." *Id.* at 894. The statements made by investigators in this case did not contradict the *Miranda* warnings; the statements conveyed that appellant's honesty might "lessen the damage," and the investigators told appellant that "lying is not gonna help you go home[,]" but their statements did not convey that no penalty or other harm would ensue if appellant was honest and told them why he had the gun.

Nor did the investigators unqualifiedly urge appellant to make an incriminating statement so as to "help himself." They repeatedly told appellant not to confess falsely. Specifically, Gamble three times told appellant, "If you didn't have a gun, don't say you had one," or words to that effect, and told appellant that he was "not trying to get you to say you had [a gun] if you didn't." Danho said, "If you didn't have a gun and you swear to it, we're not trying to convince you to say you did have the gun." Gamble also told appellant that he did not want him to "kind of try to put a story together . . . ." Thus, we cannot agree with appellant's claim that "the detectives' repeated instruction that all they needed [him] to do was

provide a 'decent reason' made it clear that their efforts were focused on obtaining an incriminating statement as opposed to the truth."[12]

Appellant asserts that the investigators told him "that providing them with an incriminating statement was his 'only' and 'last chance' to 'lessen the damage,'" but the record does not quite support that characterization. What the investigators actually told appellant was that the interview — in which he had agreed to participate without counsel — was a chance to impress prosecutors and the judge with an honest account and his "last chance" to give an account that the investigators would believe.

Further, as appellant acknowledges by quoting *Commonwealth v. Meehan*, 387 N.E.2d 527, 534 (Mass. 1979), "a police officer 'may suggest broadly that it would be better for a suspect to tell the truth'" without contravening *Miranda*. *See*

---

[12] Nor did the investigators invalidate appellant's *Miranda* waiver by asking him for a "reason" for his conduct. *Cf. Wyrick v. Fields*, 459 U.S. 42, 46-49 (1982) (rejecting any "unjustifiable restriction on reasonable police questioning" and reasoning that where the defendant "had been informed that he could stop the questioning at any time, and could request at any time that his lawyer join him[,]" asking him "if he could explain the . . . unfavorable results" of a polygraph test he had just taken "could not remove this knowledge from [his] mind" and "would not have caused him to forget the rights of which he had been advised and which he had understood moments before").

*also In re M.A.*, 33 A.3d 378, 381-82 (D.C. 2011) (stating that the law allows interrogators to tell suspects that "the best thing you can do is tell the truth"); *United States v. Bezanson-Perkins*, 390 F.3d 34, 42-43 (1st Cir. 2004) (concluding that the detective's statements that "[t]he truth opens doors," "the truth from you is what I need," and "the truth does help" did not deceive defendant in a manner that rendered his waiver ineffective).

Appellant also highlights the fact that the investigators made multiple statements that urged him to fabricate a "decent" or "good" reason for his possession of the firearm.[13] He asserts that none of the "'reasons' the investigators

---

[13] "If you had the gun for a reason, maybe they can work with that." "[I]f you say, well I wasn't gonna use it, I wasn't gonna rob somebody, you know, or somebody — someone's out for me. You know, that's understandable." "[W]e need to hear a reason . . . ." "[Y]ou got an ex-girlfriend or something like that who threatened you or — or something like that, or her brother. You know, I can understand maybe needing a gun for protection." "I mean, you need to come up with a reason you had that gun." "I mean, if your friend said hold this for a second." "I say there are legitimate reasons [to possess a gun]. . . . Sometimes it needs to happen." "[T]hat you have a reason you had [the gun.]" "Now if your boy handed you a gun, and you said, shit man I don't want this and you just kind of put it in your pocket . . . . That happens. Right?" "[T]here could have been a lot of events that took place. Whether he handed the gun to you, he got scared, you were doing . . . him a favor." "You had the gun for protection[.]" "They look at whether or not you have a reason to have that gun." "[A]s long as you — long as you give me a decent reason why you're there . . . . Where that gun came from, and why you had it on, or why you had it on you." "That's maybe why you did have a gun. . . . 'Cause if I don't know a guy[,] and I'm kind of skeptical of this guy and what he's doing' . . . maybe that's the reason why I did bring my gun." "See

(continued…)

threw out as possible explanations for the alleged gun possession — such as carrying a gun because someone was out to get him[,] or holding [the gun] for a friend — would have excused [him] from criminal liability." He argues that the investigators' statements therefore amounted to false advice "that there could be 'legitimate reasons' why he might have had a gun," constituted "substantively false legal advice [that] further obscured . . . 'the consequences of forgoing' his privilege against self-incrimination," and "thus contributed significantly to the invalidity of his waiver."

However, again, the investigators never suggested to appellant that he might be "excused" from criminal liability. Rather, they indicated to appellant — and he signified that he understood — that he was "gonna be going through the . . . process" regardless of what occurred during the interrogation and that there was "no doubt about that." We see nothing in the record to suggest that appellant failed to understand that the investigators were telling him only that a "decent" reason for possessing the firearm might lessen the sentence he would face. Again,

---

(…continued)

there's — there's many ways." "Did he ask you to hold onto it?" "I'm not saying it's yours, it could be your friend's that you were with. We want to know that. And if you tell us that, it can actually be in your favor. Did he hand the gun to you? Were you just holding it for him?"

appellant told the investigators that "[t]he shit not gonna help me" whether he said that he did not have the gun or said that he had it "for whatever reasons."[14]

Further, given that trial judges "have great latitude in the sentencing process" and "may consider a wide range of facts concerning a defendant's character and his crime," including the circumstances leading to the defendant's commission of a crime, *Williams v. United States*, 427 A.3d 901, 904 (D.C. 1980), we cannot say that the investigators' statements amount to a "deceptive tactic[]." *Little*, 125 A.3d at 1133. The investigators were correct that the prosecutor could have "worked with" appellant by recommending, and a sentencing judge could have "worked with" him by giving him, a sentence reflecting leniency if, for example, appellant had possessed the gun without intent to use it unlawfully.[15]

---

[14] Appellant is correct that, as he was making the foregoing statement, Investigator Gamble interjected, "I don't necessarily agree, but . . . I'd understand why you wouldn't trust me." We cannot say that, in the totality of the circumstances, that isolated statement, made in the midst of appellant's strong assertion that confessing would not help him and followed by appellant's agreement that he was "on the hook" and that there was "no getting out of this," vitiated appellant's waiver. Appellant asserts that this statement made clear that "his previous understanding of his *Miranda* rights was flawed . . . ." But as he manifestly "knew his words could be used against him," we "decline to conclude that any violation of his Fifth Amendment rights against self-incrimination occurred." *United States v. Umaña*, 750 F.3d 320, 345 (4th Cir. 2014).

[15] And, in that the investigators did not know what explanation appellant would offer, it was not impossible that his explanation would afford him a

(continued…)

**5. Statements that appellant asserts were to the effect that his refusal to incriminate himself would be held against him and cause him to be "hit hard" and to face "harsher consequences"**

Appellant also asserts that the investigators undermined the statement of his rights by telling him "that failure to make [an incriminating] statement would be held against him" and cause him to face "harsher consequences," and that "a judge would hold his lack of a confession — his reliance on his constitutional rights —

---

(…continued)

complete defense to the charges he faced. For example, for all the investigators knew, even as a defendant facing a felon-in-possession charge, appellant might have had an innocent transitory possession defense. *See United States v. Mason,* 233 F.3d 619, 623-25 (D.C. Cir. 2000) (holding that the district court erred as a matter of law in not instructing the jury on Mason's innocent possession defense to a felon-in-possession charge under 18 U.S.C. § 922 (g)(1)). Or, for all the investigators, knew appellant might have had the gun because he took it from someone else in an act of self-defense. *See, e.g., United States v. Leahy*, 473 F.3d 401, 403 (1st Cir. 2007) ("We hold that there is a justification defense available in felon-in-possession cases, which typically encompass duress, necessity, and self-defense."); *United States v. Planter*, 688 F.2d 268, 272 (5th Cir. 1982) ("[W]here a convicted felon, reacting out of a reasonable fear for the life or safety of himself, in the actual, physical course of a conflict that he did not provoke, takes temporary possession of a firearm for the purpose or in the course of defending himself, he is not guilty of [a felon in possession of firearm offense]."). Thus, we are unable to conclude that the investigators "[f]alsely assert[ed] that there could be 'legitimate reasons' why [appellant] might have had a gun" or that "not one of the 'reasons' the investigators" suggested would have lessened the damage.

Notably, the explanation appellant eventually gave did not rely on a defense of the type the investigators' statements had suggested (e.g., that he had the gun because someone had threatened him or a family member).

against him 'even more so' than the crime itself." Putting the point differently, appellant asserts that the investigators "engaged in a relentless attempt to make him believe that his situation would only get worse unless he confessed to them immediately, outside the presence of counsel." Appellant highlights that the investigators warned him that "he would 'piss[] the judges off' and be 'hit hard,'" with a "longer sentence," unless he confessed.[16] He contends that the investigators' statements, much like "threatening to inform the [court or the] prosecutor of a suspect's refusal to cooperate," *United States v. Harrison*, 34 F.3d

---

[16] Appellant points to the following statements by the investigators:

> And, you know, they don't like you being dishonest when you get to this point either. That kind of pisses the judges off.

> The difference is, and this is what you need to think about, is that they look at whether or not you're honest. They look at whether or not you have a reason to have that gun. All right. If you stick with it's not yours[,] and you don't have a reason, okay. You stick with the some guy I don't know went into an apartment, they — they — first of all they gonna go — I don't buy it[,] so they're not gonna buy it. And then they hold that against you, even more so th[a]n the steel."

> I don't even know how they do it, but man, they get DNA off everything. So at that point, they gonna see you in here lying, they're gonna hit you hard, man."

886, 890-91 (9th Cir. 1994), "violate[d] h[is] fifth amendment right to remain silent."

In analyzing this subset of appellant's claims, we begin by noting that both the Supreme Court and this court have held that an interrogator's informing a suspect that a "cooperative attitude would be to [his or her] benefit" does not invalidate a prior waiver of *Miranda*. *Fare v. Michael C.*, 442 U.S. 707, 727 (1979); *see also Thompkins*, 560 U.S. at 388 (recognizing, with approval, that a *Mirandized* suspect "has the opportunity to reassess his or her immediate and long-term interests[,]" including the possibility that "[c]ooperation with the police may result in more favorable treatment for the suspect"); *United States v. Umaña*, 750 F.3d 320, 344 (4th Cir. 2014) (confirming that police may "highlight the positive aspects of confession"); *United States v. Jacques*, 744 F.3d 804, 809-10 (1st Cir. 2014) (stating that it is "well settled" that an officer may tell a suspect that he will bring the defendant's cooperation to the attention of the prosecutor or "suggest[] that cooperation may lead to more favorable treatment"); *Bezanson-Perkins*, 390 F.3d at 42-43 (rejecting the claim that officers' statements invalidated the defendant's waiver of his right to remain silent where the officers "merely confirmed this situation by laying out the strong evidence they had, and then ask[ed] him why, given his understanding of things, he did not take the path that

was likely to lead to a lower sentence"; reasoning that "the context in which these statements were made shows that the officers were telling [him] that cooperating with them would be better for [him] in terms of a lower sentence").

Appellant emphasizes that the investigators never told him that they would report his cooperation to the prosecutor or judge, and he argues that the investigators' statements therefore cannot fairly be interpreted as conveying the possible benefits of an honest confession. We disagree. The investigators told appellant that the judge and attorneys would watch the video of his interview and implied that they thereby would be able to see whether, in light of other evidence, he had falsely denied a connection to the gun or instead cooperated with the police.

We also do not agree that the investigators' statements conveyed that appellant would face harsher penalties if he did not confess. Rather, we are satisfied that the investigators' statements to appellant that he may "piss off" the judge, and have it held against him *if he lied*, were truthful appraisals of the potential consequences of appellant's dishonesty. While appellant is correct that "there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the *right to remain silent* may result in harsher treatment by a

court or prosecutor,"[17] we are satisfied that such a coercive tactic is not what occurred here.

### 6. The cumulative effect of the investigators' various statements

Our analysis of the investigators' individual statements shows that, contrary to appellant's assertion, his interrogators did not "proceed to subvert [the *Miranda*] warnings at every turn" and did not "repeated[ly] mischaracterize[e]" appellant's constitutional rights. Further, as courts have aptly observed, "the very purpose of an interrogation is to obtain a confession[,]" *United States v. Wilcox*, Crim. No. 10-173 (MJD/JJG), 2010 U.S. Dist. LEXIS 104249, *12 (D. Minn. Aug. 20, 2010), and "every interrogation of a suspect contains some element of coercion or pressure to elicit a confession[.]" *United States v. Klynsma*, No. CR. 08-50145, 2009 U.S. Dist. LEXIS 93631, *74 (D.S.D. Aug. 20, 2009). We therefore demur to appellant's complaint that questioning designed to urge appellant to confess "permeated the entire interrogation." It is difficult to imagine a custodial interrogation whose entire "course" would not involve the interrogator's "repeatedly" posing questions or making statements by which, without deviation, they try to learn, through a confession, what actually happened. Nevertheless,

---

[17] *S.W.*, 124 A.3d at 103 (quoting *Harrison*, 34 F.3d at 891).

having performed a statement-by-statement and subset-by-subset analysis of the interrogators' statements,[18] we must consider whether the statements, though not problematic individually or in combination under one of appellant's theories, might have had the cumulative effect of vitiating appellant's *Miranda* waiver. Therefore, we next consider appellant's argument his interrogators' "relentless[ly]" delivered the "pervasive message" that he "could face other charges, including murder," and be "'hit hard' at sentencing" unless he did as Investigator "Gamble instructed": give the investigators "'a decent reason' why he had a gun."

For the following reasons, we are satisfied that the investigators' statements and questions did not have the cumulative effect of rendering appellant's waiver

---

[18] This approach is consistent with the approach taken in our prior *Miranda* cases. For example, in *In re S.W.*, after explaining the context of appellant's interrogation and the general factors on which we rely in a totality-of-circumstances analysis, we analyzed and took specific issue with the officers' statement telling appellant they (the officers) were the only barrier between him and "the lions out there." 124 A.3d at 94. In *Little*, although "we reach[ed] th[e] conclusion [that Mr. Little's confession was involuntary] based on the totality of the circumstances," we were "focus[ed] particularly []on the detective's threatening statements about the possibility [that] Mr. Little would be sexually assaulted in jail if he did not confess and their suggestions that he could not meet with a lawyer until he put 'some meat' 'on the table.'" 125 A.3d at 1127. Thus, our analytical approach set out above not only is permissible, but also is required under our case law as a basis for determining whether the interrogation involved any such singularly coercive or vitiative statements.

invalid. First, the interrogation was a relatively short one,[19] lasting approximately one and a half hours — which time was punctuated with a bathroom break, with a repeat of the *Miranda* warnings, and, during the questioning, by repeated long pauses (at least seventeen by our count) that appellant took (and seemed comfortable taking) before responding to the investigators' questions. Appellant rebuffed certain statements the investigators made to him (telling them that "whatever reason[]" he might offer for having a gun was "not gonna help [him]" or enable him to avoid "do[ing] the protocol," and he got the investigators to agree with *him* ("Yeah, you gonna be going through . . . the process, ain't no doubt about that."). When Gamble told appellant that he could face additional charges related to the gun and the judge or jury would likely believe the officer who said he heard appellant drop the gun, appellant told them, "I already know. I understand all that" and "I understand. I really do." Thus, the overall tenor of the interrogation was not, as appellant asserts, a "steady corrosion" of the understanding appellant had

---

[19] *Cf. Crear v. Gipson*, No. C 12-5149 RS (PR), 2013 U.S. Dist. LEXIS 139901, *15 (N.D. Cal. Sept. 26, 2013) (noting that the habeas petitioner "was subject to two relatively short interrogations (90 minutes and two and a half hours")); *McCann v. Trombley*, 2009 U.S. Dist. LEXIS 37407, *12, 13 ( E.D. Mich. May 4, 2009) (referring to an interview with one detective that "lasted about two and a half to three hours" and a second interview with a police sergeant that "lasted an hour and a half to two hours" as a "relatively short interrogation"); *Kissinger v. Pitcher*, No. 4:04-CV-101, 2006 U.S. Dist. LEXIS 65327, *26 (W.D. Mich. Aug. 14, 2006) ("Petitioner was subjected to a relatively short interrogation, being questioned for little over an hour.").

when he heard the *Miranda* warnings and waived his right to remain silent and to have an attorney present for questioning. Even after beginning his confession by saying, "I think I was set up," appellant took long pauses, evidencing that he was still thinking about whether to go further rather than caving in the face of anything the investigators had said to him.

Further, not just at the beginning of the interview but throughout the exchanges between appellant and the investigators, appellant (and the investigators) appeared relaxed, and the investigators neither raised their voices, nor invaded appellant's personal space, nor aggressively challenged his answers. As described above, they also displayed a willingness to "step outside" and give appellant "a few minutes to think" and to relent in their questioning. For example, when appellant initially responded that he did not want to answer any questions, Investigator Gamble said, "All right. That's it then," and the investigators began gathering their materials to leave the room. When appellant later would not give a reason why he had the gun, Investigator Gamble said, "we'll go with that" and "go and sit on back downstairs." Both investigators repeatedly told appellant not to confess falsely, Gamble telling him that three times before he confessed and Danho twice saying words to the effect that if the gun was not appellant's, he should "stick to" his denial. All these facts, coupled with the fact that this was not

appellant's first encounter with the criminal justice system, leave us quite satisfied that the cumulative effect of the statements and questions about which appellant now complains was not to undermine and vitiate his *Miranda* waiver.

## B.  Whether appellant's confession was voluntary

Appellant also contends that "[t]he investigators' 'undeviating intent to extract a confession' . . . violated due process and rendered [his] confession involuntary" and inadmissible for any purpose.  "The test for determining the voluntariness of specific statements is whether, under the totality of the circumstances, the will of the suspect was overborne in such a way as to render his confession the product of coercion." *Turner v. United States*, 761 A.2d 845, 854 (D.C. 2000) (internal quotation marks and brackets omitted). "In determining whether, under the totality of the circumstances, a confession is voluntary, the trial court should consider the same factors it takes into account in determining the validity of a waiver following *Miranda* warnings[,]" *Beasley v. United States*, 512 A.2d 1007, 1015 (D.C. 1986) (citing *Bliss v. United States*, 445 A.3d 625, 631 (D.C. 1982)), including "the suspect's age, education, prior experience with the law, and physical and mental condition," as well as the "duration and intensity [of the interrogation], the use of physical punishment, threats or trickery, and whether

the suspect was advised of his rights." *Graham v. United States*, 950 A.2d 717, 736 (D.C. 2008) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)); *see also Miranda*, 384 U.S. at 98.

Considering the totality of the circumstances, we reject appellant's argument that his confession was involuntary. To recap what we have said above, appellant, a thirty-one-year-old adult, was no novice to the criminal system. He was advised of his rights (twice), underwent a relatively short (a little over an hour) and conversational-tone interrogation, was permitted to use the bathroom, was offered medical help, and apparently felt comfortable enough and sufficiently in control during the interrogation to take repeated long pauses before answering the investigators' questions. The Supreme Court has observed that "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984); *see also Missouri v. Seibert*, 542 U.S. 600, 608–09 (2004) ("[M]aintaining that a statement is involuntary even though given after [*Miranda*] warnings and voluntary waiver of rights requires unusual stamina . . . ."). We are satisfied that this is not that rare case.

We have concluded that confessions were voluntary though obtained in significantly more physically trying circumstances than those presented here. In *Dorsey*, for example, we were unanimous in holding that Dorsey's confession was voluntary even though the officers (who in violation of Dorsey's *Miranda* rights, continued their questioning after he had invoked his right to remain silent), interrogated him for thirteen hours (that extended through the middle of the night) and ignored his numerous pleas for sleep as well as his physical expressions of fatigue; and even though Dorsey, suffering alcohol withdrawal, had urinated on himself, was sweating profusely, and was "shaking like a leaf." 60 A.3d at 1180-87, 1202-06. In *Bliss*, we concluded that Bliss's confession was voluntary even though officers questioned him shortly after he had been shot, "was in pain from the gunshot wound," was still awaiting treatment, and was visibly cold. 445 A.2d at 631.

Further, this court and others have found that a defendant's confession made during a custodial interrogation was voluntary even though the interrogators exaggerated the existence or strength of evidence inculpating the suspect;[20]

---

[20] *See, e.g.*, *Graham*, 950 A.2d at 723, 737 (concluding that the nineteen-year-old defendant's confession was voluntary even though a detective falsely told him that a witness had identified him); *Davis*, 724 A.2d at 1168 (concluding that the eighteen-year-old defendant's confession was voluntary even though detectives

(continued…)

conveyed the gravity of the defendant's situation by referring to charges he might face;[21] urged the suspect to tell the truth and indicated that the suspect's cooperation would be brought to the attention of prosecutors;[22] or (as appellant contends happened here) threatened a harsher sentence for failure to cooperate.[23]

---

(…continued)

falsely told him that they had evidence establishing his guilt); *Beasley*, 512 A.2d at 1015 (concluding that Beasley's confession was voluntary even though officers falsely told him that "his fingerprints had been found in the [d]ecedent's car, and that [numerous witnesses] could identify [him] as the assailant").

[21] *See, e.g.*, *Braxton*, 112 F.3d at 782 ("[T]ruthful statements about the defendant's predicament are not the type of coercion that threatens to render a statement involuntary." (internal quotation marks and brackets omitted)).

[22] *See, e.g.*, *Beasley*, 512 A.2d at 1016 (Officers' comments that defendant "should 'help himself' and 'tell the truth' and that any cooperation would be communicated to the prosecutor" were not "'sufficiently critical' to have overborne [his] ability to make a free and voluntary confession." (citation omitted)); *see also Jacques*, 744 F.3d at 809-10 ("[A]n officer does not impermissibly overbear a defendant's will by promising to bring the defendant's cooperation to the prosecutor's attention or by suggesting that cooperation may lead to more favorable treatment."); *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) ("Generally, promises of leniency will not render a confession involuntary."); *United States v. Ornelas-Rodriguez*, 12 F.3d 1339, 1348 (5th Cir. 1994) (upholding finding that defendant voluntarily confessed after being told there were advantages to cooperation).

[23] *See, e.g.*, *Jacques*, 744 F.3d at 811 ("[T]here is no evidence suggesting that [the agents'] threats of a harsher sentence in exchange for Jacques's refusal to cooperate had any meaningful impact on Jacques's conduct during the interrogation."); *see also United States v. Sablotny*, 21 F.3d 747, 752-53 (7th Cir. 1994) (reasoning that an officer's statement to a suspect "that she would probably go to jail" was not coercive because it did not "magnify . . . matters to the point where a rational decision b[ecame] impossible." (citation omitted)).

As evidence of the purported involuntariness of his confession, appellant points to his "ultimate adoption — following persistent denials — of one of the 'reasons' police repeatedly fed to him . . . ." This, appellant argues, "strongly suggests that the coercive tactics in this case actually bore fruit." He cites this court's decision in *In re J.F.*, 987 A.2d 1168, 1178-79 (D.C. 2010) (concluding that the defendant's confession was involuntary where it was made up of details fed to him by the police following their repeated coercive tactics).

This case actually differs significantly from *J.F.* In *J.F.*, the fourteen-year-old defendant confessed after the interrogator hovered over him in a loud and confrontational voice and after he had exclaimed "[h]ow I'm gonna tell you something I don't know?" *Id.* at 1174-75. We observed that "the majority of J.F.'s final confession was comprised of details that J.F. had adopted from the officers' suggestions." *Id.* at 1177; *see also id.* at 1175 ("[M]any of the details in this version of the story had initially been provided by Sgt. Parker."); *id.* at 1179 ("[M]ost of the details of J.F.'s confession were initially provided by the officers." (footnote omitted)).

Here, after the investigators asked whether the other man had "handed the gun to [appellant]," appellant did say that the man to whom he had given a ride handed the gun to him. However, unlike in *J.F.*, appellant added details that had not been suggested by the interrogators' questions, explaining that this happened "[w]hen we got to the . . . building door," when the man "was trying to get inside the door [of the apartment building]." Appellant thus returned to the account he had given the investigators a few transcript pages into the interview, when he said that he and the other man were "trying to get in the building," but were having trouble doing so. Appellant also explained that the man said "hold this right quick[.] [M]y t-shirt [is] too short." Further, appellant explained that the other man had the gun — which appellant said (correctly) had a "wood handle" — because they (the other man *and* appellant) were trying to "sell the gun to somebody." Thus, appellant not only told the investigators that the man had handed the gun to him, as the investigators had suggested, but went further and acknowledged that his involvement with the gun was neither last-minute nor unthinking. And, in supplying the detail about the wood handle, he gave the investigators' information that only someone who had handled or seen the recovered gun would know. On this record, we will not infer that appellant's confession, which went far beyond the lines of "one of the stories [the investigators] had proposed," was the product of his will having been overborne.

Finally, appellant argues that through their various statements discussed above, the investigators exhibited an "undeviating intent . . . to extract a confession," *Spano v. New York*, 360 U.S. 315, 324 (1959), that, as in *Spano*, rendered his confession involuntary. It is true that in *Spano*, the Supreme Court concluded that the "undeviating intent to extract a confession" (through "persistent and continuous" efforts, including the sequential use, over an eight-hour period, of at least four different interrogators and, finally, Spano's close, childhood friend, *see id.* at 317-20) contributed to rendering Spano's confession involuntary. The Court has not, however, generally rejected law enforcement officials' deliberate efforts to obtain confessions. The Court has recognized that "[a]dmissions of guilt are more than merely 'desirable[]'; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Moran v. Burbine*, 475 U.S. 412, 426 (1986) (citation omitted).

In any event, this case does not present a chronology similar to the one in *Spano*. Again, when appellant would not give a reason why he had the gun, Gamble said that the investigators would just "go and sit on back downstairs." Earlier, when appellant initially responded that he did not want to answer any questions, Investigator Gamble said, "All right. That's it then[,]" and the

investigators began gathering their materials to leave the room. This record does not bear the "undeviating" or unrelenting effort to extract a confession characterization appellant assigns to it.

Moreover, appellant's confession came only after he had taken several long pauses to think and a bathroom break, and after he beckoned Investigator Danho, who had stood up as if to leave, to sit down again. Those facts make this case much more like *Jacques* than like *Spano*. As appellant notes, in concluding that Jacques's confession was voluntary, the First Circuit observed (in appellant's words) that "the defendant confessed not immediately after the police's urging that the confession would help him, but only after he had taken a cigarette break and returned to the room to tell the detectives he wanted to confess because he realized they had sufficient evidence to prove the case against him."

## IV. Conclusion

For the foregoing reasons, we conclude that the interrogators' statement did not vitiate appellant's *Miranda* waiver and that appellant's confession was voluntary. We therefore affirm the denial of appellant's motion to suppress and the judgment of the trial court. [24]

*Affirmed.*

---

[24] On April 10, 2017, the government submitted a letter, pursuant to D.C. App. R. 28 (k), in which it distinguished numerous cases appellant had cited in his Reply Brief. Thereafter, appellant filed a motion to strike the government's letter, arguing that it "violate[d] the plain language of the Rule [28 (k)], which states that a 28[](k) letter may not contain argument." Appellant's motion is granted to the extent that the government's letter contains argument.

Appellant's motion for leave to late-file his reply brief is granted *nunc pro tunc*.